**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR-4963)
Sharon L. Levine, Esq. (SL-2109)
S. Jason Teele, Esq. (SJT 7390)
Kimberly Goldberg (KG 0117)
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Creative Group., Inc., *et al.*,[1] | Case No. 08-10975 (RDD) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004, 6006, AND 9014 (A) APPROVING (I) BIDDING PROCEDURES, (II) CERTAIN BID PROTECTIONS, (III) FORM AND MANNER OF SALE NOTICES, AND (IV) SALE HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES**

---

[1]    The Debtors are: (1) Creative Group, Inc.; (2) Animagic LLC; (3) Fangoria Entertainment, Inc.; (4) Nate the Great LLC; (5) Moe Greene Entertainment LLC; (6) Starlog Entertainment, Inc.; (7) Starlog Group, Inc.; (8) Starlog Licensing of America, Inc.; and (9) Tangerine LLC.

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Sellers"), by their proposed undersigned attorneys, hereby move this Court for orders under 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) approving (i) bidding procedures, (ii) certain bid protections, (iii) form and manner of sale notices, and (iv) sale hearing date and (b) authorizing and approving (i) sale of substantially all of the Debtors' assets free and clear of liens, claims, and encumbrances, (ii) assumption and assignment of certain executory contracts and unexpired leases, and (iii) assumption of certain liabilities (the "Motion"). In support of this Motion, the Debtors respectfully represent as follows:

<u>**RELIEF REQUESTED**</u>

1.     By this Motion, the Debtors seek entry of two orders. First, at the hearing on April 15, 2008, the Debtors request entry of an order substantially in the form attached hereto as <u>Exhibit A</u> (the "Bidding Procedures Order") approving the Bidding Procedures (defined below), notice procedures, and certain bid protections to be provided to the Purchaser (defined below) pursuant to the Agreement (defined below) as described more fully herein. Second, subject to the terms of the Bidding Procedures Order, at a hearing to be scheduled by the Court, the Debtors request entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Sale Order") authorizing and approving the sale, the assumption and assignment of the Assumed Contracts and Assumed Leases (defined below), and the assumption of the Assumed Liabilities (defined below).

2.     As discussed herein, after a comprehensive review and marketing process, the Debtors believe that a sale of their assets on the terms and conditions described herein and in the Agreement is their best opportunity under the circumstances to maximize the underlying value of their assets and businesses and that, therefore, the sale is in the best interests of their estates and creditors.

## JURISDICTION

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested herein are §§ 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

5.      On March 21, 2008, (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

6.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or creditors' committee has been appointed in any of these chapter 11 cases.

**A.**      **Nature Of The Debtors' Business Operations.**

7.      The Debtors, collectively, are a diversified entertainment and media company that produces live action, animation, sound design, sound mixing and recording and broadcast design for the television and film industries. The Debtors' services span all media types with operations comprising the entire spectrum of concept development through creative implementation, production, post-production, and distribution. The Debtors are well known for their award-winning work on behalf of cable and broadcast networks owned by international media companies such as The Walt Disney Company (ESPN, ABC, The History Channel, A&E), Viacom (CBS, MTV, VH-1, Nickelodeon, Spike), General Electric (NBC, MSNBC), Comcast Cable (Versus), and Time Warner (Time Warner Cable).

8.      In recent years, the Debtors have also embarked on an aggressive program of original content property development. These assets include animated series, live action features, documentaries, television and radio programming, web content, and magazine publishing. For the purposes of cross-promotion and brand extension, the Debtors have made,

and continue to make, significant investments in entertainment properties and marketing capabilities, movies and television productions, genre fan magazines, web sites, brand management and marketing expertise, graphic design and advertising capabilities.

**B.          Prepetition Indebtedness And Capital Structure.**

9.      Creative Group is a private corporation with thirteen (13) shareholders holding the approximately 1.5 million shares of stock outstanding.

10.     As of the Petition Date, the Debtors were indebted to Signature Bank ("Signature") in the aggregate principal amount of approximately $16,559,260.16 (the "Signature Loan"), pursuant to (i) a credit agreement dated as of September 28, 2006 by and among Signature and Creative Group, Inc.  (the "Credit Agreement); (ii) a term note dated as of September 28, 2006 in the aggregate principal amount of $15,000,000 executed by Creative Group, Inc.  in favor of Signature (the "Term Note"); and (iii) a revolving credit note dated as of September 28, 2006 in the aggregate principal amount of $3,000,000 executed by Creative Group, Inc.  in favor of Signature (the "Revolving Note" and, together with the Credit Agreement and Term Note, the "Prepetition Credit Documents"). Pursuant to two separate guarantee agreements (collectively, the "Guarantee") each dated as of September 28, 2006, each of the Debtors guaranteed the obligations of Creative Group, Inc.  to Signature under the Prepetition Credit Documents, and Joseph V.  Avallone guaranteed the obligations of Creative Group, Inc.  up to $6 million. The Debtors' obligations to Signature under the Prepetition Credit Documents are secured by substantially all of their assets pursuant to a security agreement dated as of September 28, 2006.

11.     The Debtors used the proceeds of the Signature Loan to fund their working capital requirements.

12.     Additionally, as of the Petition Date, the Debtors were indebted to Allied Capital Corporation ("Allied") in the aggregate principal amount of approximately $15 million pursuant to a 12% subordinated secured note dated as of September 12, 2006 executed by

Creative Group, Inc., Fangoria Entertainment, Inc., Moe Greene Entertainment, LLC, Tangerine, LLC, Animagic, LLC and Nate The Great, LLC in favor of Allied (the "Subordinated Note"). The Subordinated Note is secured by substantially all of the Debtors' assets pursuant to a prepetition security agreement by and among Allied and the Debtors. Allied's security interests in and liens upon the Debtors' assets are subordinated to Signature's liens and security interests pursuant to a Subordination and Intercreditor Agreement dated as of September 28, 2006.

13. The Debtors used the proceeds of the Subordinated Note to develop the Nate the Great animated series in partnership with PBS, to acquire the Fangoria and Starlog magazines and related properties, and to expand into other intellectual properties (such as the development of feature length films and a radio program for Sirius Satellite Radio).

14. The Debtors currently have approximately $1.1 million in outstanding obligations to trade vendors as of March 18, 2008.[2]

**C.      Events Leading To Debtors' Chapter 11 Filings.**

15. In 2005, the Debtors received a commitment from PBS to develop the Nate the Great children's books into an animated television series. PBS committed to an initial order of forty (40) animated episodes. In addition, PBS committed to financing approximately $3,000,000 of the production budget. The initial production budget was approximately $17,000,000.

16. In November, 2004, the Debtors entered into an installment agreement with Starlog Group, Inc. to purchase all of the stock of the company. The installment agreement required the Debtors to pay $40,000 per month for 12 months; $60,000 per month for the next 12 months; $100,000 per month for the next 12 months; and $200,000 per month for the final 12 months. The Debtors had the right to cancel the installment agreement at the end of 24 months with all payments made through that date retained by Starlog Group, Inc. as licensing fees.

17. In 2005, the Debtors retained Banc America Securities as their investment

_____
[2]      The Debtors' Schedules of Assets and Liabilities will be filed with the Court on or about April 7, 2008.

banker to help raise $20,000,000 of financing to support the Debtors' development of the Nate the Great series and fund the acquisition of Starlog Group, Inc. Banc America solicited many investors but were unsuccessful in securing the $20,000,000 private placement.

18. Subsequently, the Debtors retained JDM Partners as their investment banker. JDM Partners received term sheets from two prospective investors: Peppertree Capital and Allied. The Debtors selected the Peppertree Capital proposal because Peppertree Capital was willing to commit to $15,000,000 while Allied Capital was willing to commit only $12,000,000. When the Debtors could not close the commitment with Peppertree Capital, they re-solicited Allied, and the parties negotiated and then entered into the Subordinated Note.

19. The proceeds of the Subordinated Note were used to fund the Debtors' development of the Nate the Great series, immediately pay off the remaining installments to complete the acquisition of Starlog Group, Inc., continue production of a radio program for Sirius Satellite Radio, and begin the development of a feature film relationship with a major studio. However, production delays, production costs in excess of budgeted amounts and the opportunity costs associated with focusing on these properties to the exclusion of the Debtors' core service business caused a decline in revenue. In addition, royalty revenues were below original projections. As a result, the Debtors found themselves unable to service both the Signature and Allied debt. In response to their liquidity crisis, the debtors halted production on their Nate the Great property and feature film development efforts.

20. When the Debtors' efforts to reverse the severe liquidity shortfalls failed, they took the necessary step of filing for chapter 11 protection to stabilize their day-to-day operations, avail themselves of the financing provisions of the Bankruptcy Code, and protect and preserve the value of their assets for the benefit of their creditors.

**D.      The Debtors' Prepetition Efforts To Sell The Assets**

21. Prior to the Petition Date, the Debtors, after consultation with Signature, retained CantorAdvisors to provide restructuring alternatives. Upon consultation with

CantorAdvisors in mid-May 2007, the Debtors spent four months attempting to restructure its obligations with Signature Bank and Allied Capital. When restructuring efforts eventually failed, the Debtors determined that a sale of their assets provided the best hope for a restructuring.

22. Prepetition, the Debtors solicited offers from approximately 45 financial and strategic potential buyers. In August and September of 2007, CantorAdvisors and the Debtors' management sent teasers and calls to approximately 25 parties who are known to invest in special situations. Five (5) of these parties were interested and completed due diligence over the next several months. At the end of this process, the highest and best offer was submitted by Scorpion Capital Partners, L.P. ("Scorpion Capital"). In January 2008, an additional 20 special situations investors were contacted to determine if a higher bid could be obtained. No other party submitted an offer that was higher or better that Scorpion Capital's offer.[3]

23. Between June 2007 and August 2007, the Debtors also solicited buyers and ultimately reached an agreement with Riverlight Productions, Inc. for sale of the Debtors' Nate the Great assets. However, during the due diligence process, completed between September 2007 and November 2007, Riverlight Productions determined that it was dissatisfied with the original license of the Nate the Great assets from the original author. After unsuccessful negotiations with the original author, the Riverlight Productions chose not to complete the acquisition.

24. Thus, prepetition, the Debtors and their financial advisor undertook an extensive effort to sell the Debtors' assets for the highest price and the most favorable terms. After soliciting approximately 45 potential buyers and coordinating due diligence with several of them, the Debtors determined that the Scorpion Capital offer was superior. The Debtors then negotiation with Scorpion Capital for its offer to be used as a stalking horse bid in any ensuing

---

[3] Although Allied submitted several offers, none would have fully satisfied the Debtors' obligations to Signature and all included certain provisions (e.g., employment contingencies) which the Debtors deemed to be unacceptable.

auction conducted under the auspices of this Court. After agreeing to the bid protections (described below), Scorpion Capital agreed to be the stalking horse bidder.

**E.      The Postpetition Due Diligence Process.**

25.      To guarantee that interested parties receive diligence materials without interference from the Debtors or their management (some of whom are affiliated with Scorpion Capital) the Debtors propose to place control of the diligence process in the hands of the Official Committee of Unsecured Creditors (the "Committee"), if one is appointed on or before the April 15, 2008 hearing scheduled in this matter. If a Committee is not appointed, the Debtors will file an application to retain Getzler Henrich & Associates, LLC third party with whom the Debtors agree to serve as the Sale Agent (the "Sale Agent").[4] As will be set forth in more detail in a retention application, the Sale Agent has no connections to the Debtors, any officers, directors or employees of the Debtors, Newco, Signature, or Allied. Moreover, the Sale Agent does not represent any party that has previously expressed an interest in purchasing the Debtors' assets.

26.      Placing the diligence process under the control of the Committee or Sale Agent will eliminate any appearance of impropriety or manipulation that may otherwise be alleged to be present due to involvement with Newco of some of the Debtors' insiders (as discussed below).

**F.      The Stalking Horse Bid And Asset Purchase Agreement.**

27.      Prior to the Petition Date, the Debtors negotiated an asset purchase agreement (the "Agreement") with an entity to be formed for the purpose of acquiring the

---

[4]      An application to retain Getzler Henrich & Associates, LLC (or such other firm as the Debtors, in the exercise of their business judgment, determine would be an appropriate party to serve as the Sale Agent) will be filed on or before April 15, 2008, and will be accompanied by an Order to Show Cause requesting a preliminary hearing at the Court's earliest availability.

Debtors' assets (the "Purchaser" or "Newco"). A copy of the form of Agreement is annexed hereto as Exhibit C.[5]

28. The Purchaser is a newly formed entity that is owned and controlled by Scorpion Capital (and certain shareholders and employees of the Debtors).[6]

29. The Agreement is the culmination of the Debtors' prepetition marketing process (discussed above) and months of negotiations to restructure or refinance the Debtors' prepetition debt. Because the value of the Debtors' business and assets is inextricably tied to the creative talent and client contacts of its existing employees, including, in particular, the Debtors' senior management, it became apparent that outside buyers would not likely be willing to pay an amount equal to the amounts owing to Signature (as the holder of the Debtors' senior secured debt) simply for the assets with new management. As previously discussed, despite the Debtors' prepetition marketing efforts, no other party has submitted an offer to purchase the Debtors' assets on terms that would fully satisfy the Signature debt.

30. Signature, which is also the Debtors' postpetition lender, has agreed to restructure the prepetition debt as a second lien, junior to the new financing to be provided to the Purchaser by PNC Business Credit at the closing of the proposed sale transaction.

31. Pursuant to the Agreement, the Sellers propose to sell, assign and transfer to Purchaser substantially all of their assets free and clear of all liens, claims and encumbrances, with such liens, claims and encumbrances to attach to the proceeds of the sale. The assets to be sold (the "Assets") include:[7]

---

[5]     The Debtors seek authority to enter in an Agreement substantially in the form of Exhibit C.

[6]     The shareholders and employees of the Debtors who are anticipated will have an interest in Newco are: Joseph V. Avallone, Joseph Castellano, Robert Gleason, Wayne Stevenson, David Klinkowize, John C. Lamson, Dale M. Boyce, Michael B. Buckner, Jonathan R. Budine, David S. Chaiken, Keith A. Crago, Raymond Rothaug, Susan Pelino, Kassie Caffiero, and Frederick Salkind.

[7]     Unless otherwise defined herein, capitalized terms used in the following section shall have the meaning ascribed to such terms in the Agreement.

(a)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits;

(b)     all Accounts Receivable;

(c)     the right to receive and retain payments in respect of any Accounts Receivable and the right to receive and retain Sellers' mail and other communications relating to the Business;

(d)     all Equipment;

(e)     all Contracts listed or described on Schedule 2.1(e) of the Agreement  (the "Assumed Contracts");

(f)     all Leases of Leased Real Property listed or described on Schedule 2.1(f), including any improvements to such Leased Real Property (such Leases, the "Assumed Leases");

(g)     all Permits and pending applications therefor, in each case to the extent assignable;

(h)     all Intellectual Property (including all goodwill associated therewith);

(i)     all Products, including all products in development by Sellers and the Purchased Entities;

(j)     all Documents except those (i) relating primarily to any Excluded Asset or Excluded Liability; or (ii) relating to employees of Sellers who are not Transferred Employees;

(k)     all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business, to the extent assignable;

(l)     all Purchased Deposits;

(m)     all rights to proceeds under insurance policies relating to claims for losses related to any Purchased Asset or Assumed Liability (including, without limitation, that certain insurance claim in the approximate amount of $300,000 relating to the warehouse fire);

(n)     the capitalized leases listed or described on Schedule 2.1(n) of the Agreement (the "Assumed Capitalized Leases");

(o) any rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of Sellers against third parties arising out of events occurring prior to the Closing Date, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, excluding only the rights, claims, refunds, causes of action, chooses in action, rights of recovery and rights of setoff that are identified as Excluded Assets in Section 2.2 of the Agreement;

(p) all goodwill and other intangible assets associated with the Business or the Purchased Assets;

(q) any proprietary rights in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(r) Avoidance Actions;

(s) all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Business;

(t) all rights of Sellers under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with former employees of Sellers, agents of Sellers or with third parties, provided, however, that Buyer shall not be deemed to assume any such agreements except as explicitly provided in Section 2.3 of the Agreement; and

(u) all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Sellers related to the Business of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement.

32.     The Agreement excludes certain assets from the sale.  The excluded assets include:

(a)     all shares of capital stock or other equity interest of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller;

(b)     all direct and indirect Subsidiaries of Sellers;

(c)     all minute books, stock ledgers, corporate seals and stock certificates of Sellers;

(d)     any Contracts not listed or described in Schedule 2.1(e) of the Agreement (the "Excluded Contracts");

(e)     any Leases, and rights thereunder, not listed or described in Schedule 2.1(f) of the Agreement (the "Excluded Leases");

(f)     any rights, claims or causes of action of Sellers under this Agreement or the Ancillary Documents, including all right, title and interest to the Aggregate Cash Consideration;

(g)     all receivables, claims or causes of action related primarily to any Excluded Asset;

(h)     all insurance policies, including but not limited to rights under director and officer liability policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies relating to claims for losses related primarily to any Excluded Asset or Excluded Liability;

(i)     all Documents relating primarily to an Excluded Asset or an Excluded Liability; and

(j)     all assets of any Seller set forth on Schedule 2.2 of the Agreement.

33.     Additionally, the Purchaser has agreed to assume the following liabilities of the Sellers:

(a)     Assumed Contracts and Assumed Leases.  All Liabilities of any Seller arising at and after the Closing under the Assumed Contracts and the Assumed Leases.

(b)     Capitalized Leases.  All Liabilities of any Seller due or arising at and after the Closing under the Assumed Capitalized Leases.

34.     As consideration for the transaction, the Purchaser will pay an amount equal to (i) the sum of (x) all amounts due to Signature (whether for principal, interest, costs or otherwise) under the Prepetition Credit Documents, (y) all amounts due Signature under the debtor-in-possession loan agreement and (z) the costs to cure any arrears under any Assumed Contract or Assumed Lease, and (ii) the assumption by Buyer of the Assumed Liabilities (collectively, the "Purchase Price").[8]

35.     If the Purchaser is not the successful bidder for the assets, it is entitled to a break-up fee equal to three percent (3%) of the Purchase Price plus an expense reimbursement equal to Purchaser's fees and expenses (up to an additional one-half percent of the Purchase Price) associated with negotiating the Agreement. *See* Agreement at § 9.2(b).

36.     The proposed sale is subject to approval by this Court and additional competitive bidding pursuant to the Bidding Procedures described below.

**G.     The Proposed Bidding Procedures.**

37.     The Sale of the Debtors' assets is subject to higher or otherwise better offers pursuant to the Bidding Procedures. Accordingly, the Debtors seek approval of the Bidding Procedures attached hereto as <u>Exhibit D</u>. The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (defined below), the ultimate selection of the successful bidder(s), and the Court's approval thereof (collectively, the "Bidding Process").

38.     The proposed Bidding Procedures provide, in relevant part, as follows:[9]

---

[8]     The Debtors estimate the Purchase Price will total between approximately $16.5 million to approximately $17.0 million.

[9]     This section describes the salient provisions of the Bidding Procedures.  For a complete description of the Bidding Procedures, parties are commended to Exhibit D.

(a)     <u>Assets To Be Sold</u>. The assets proposed to be sold are the Assets (as defined in the Agreement and as more fully set forth in section 2.1 of the Agreement).

(b)     <u>As Is, Where Is</u>.  The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Agreement and, with respect to a Successful Bidder, to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

(c)     <u>Free Of Any And All Claims And Interests</u>. The Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "Claims and Interests") and the Claims and Interests shall attach to the net proceeds of the sale of such Assets.

(d)     <u>Participation Requirements</u>. To ensure that only bidders with a serious interest in the purchase of the Assets participate in the Bidding Process, the Bidding Procedures provide for certain minimal requirements for a potential bidder to become a "Qualified Bidder." These requirements include (i) executing a confidentiality agreement substantially in the form attached to the Bidding Procedures, (ii) providing the Sellers with certain financial assurances as to such bidder's ability to close a transaction, and (iii) submitting a preliminary proposal reflecting any Assets expected to be excluded and the purchase price range.

(e)     <u>Due Diligence</u>. The Bidding Procedures permit all Qualified Bidders an opportunity to participate in the diligence process.  The Committee, or if a Committee has not been appointed on or before April 15, 2008, the Sale Agent, will coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.  The Sellers shall not control or oversee, but shall cooperate with the Committee and/or Sale Agent in, the diligence process.

(f)     <u>Bid Deadline</u>.  The Bidding Procedures provide for a bid deadline of 11:00 a.m.  (prevailing Eastern time) on May 30, 2008 (the "Bid Deadline"). All bids must be submitted on or before the Bid Deadline to (i) counsel for the Debtors, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey 07068, Attention: Kenneth A.  Rosen, Esq.  <u>krosen@lowenstein.com</u> and Sharon L.  Levine, Esq. <u>slevine@lowenstein.com</u>, S.  Jason Teele, Esq.  <u>steele@lowenstein.com</u>, and Kimberly Goldberg, Esq.  <u>kgoldberg@lowenstein.com</u>, (ii) counsel for Signature Bank, Duane Morris LLP, 1540 Broadway, New York, NY 10036-4086, Attention: Laurence S. Hughes,  Esq.,  <u>lshughes@duanemorris.com</u>,  and  Lawrence  Kotler,  Esq., <u>lkotler@duanemorris.com</u>,  (iii) counsel for the Purchaser, Nixon Peabody LLP, 555 West Fifth Street, 46th Floor, Los Angeles, California  90013, Attention: David M. Tamman, <u>dtamman@nixonpeabody.com</u>, (iv) counsel to Allied Capital Corporation, Greenberg Traurig, LLP, 200 Park Ave., New York, New York 10166, Attention: Nancy A.  Mitchell, Esq., MitchellN@gtlaw.com and John W.  Weiss, Esq., WeissJW@gtlaw, (v) counsel for the Official Committee of Unsecured Creditors,

_____, (vi) the proposed Sale Agent (if retained), Getzler Henrich & Associates, LLC, 295 Madison Avenue, New York, New York 10017, Attention: Mark Podgainey, mpodgainy@getzlerhenrich.com, and (vii) the United States Trustee for Region 2, 33 Whitehall Street, Suite 2100, New York, New York 10004, Attention: Greg Zipes, greg.zipes@usdoj.gov.

        (g)     Bid Requirements. All bids must include the following documents: (i) a letter stating that the bidder's offer is irrevocable for the period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a good faith deposit of ten percent (10%) of the aggregate bid amount, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

        (h)     Qualified Bids. To be deemed a "Qualified Bid," a bid must be received by the Bid Deadline and, among other things, (i) must be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to Sellers than those contained in the Agreement, (ii) must not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) must have a value greater than the purchase price reflected in the Agreement plus the amount of the Break-Up Fee plus $250,000.00, (iv) must not be conditioned on bid protections, other than those contemplated in the Bidding Procedures, (v) must contain acknowledgements and representations as set forth in the Bidding Procedures, and (vi) include a commitment to consummate the purchase or the Assets within not more than 15 days after entry of a Bankruptcy Court order approving such purchase. The Sellers, in consultation with the Committee, or if a Committee has not been appointed on or before April 15, 2008, the Sale Agent, retains the sole right to deem a bid a Qualified Bid, if such bid does not conform to one or more of the aforementioned requirements, provided however, that such bid must have a value greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus $250,000.00, taking into account all material terms of any such bid. Each Qualified Bid other than that of the Purchaser shall be called a "Subsequent Bid."

        (i)     Bid Protection. Recognizing the Purchaser's expenditure of time, energy, and resources, the Sellers have agreed to provide certain bidding protections to the Purchaser. Specifically, the Sellers have determined that the Agreement will further the goals of the Bidding Procedures by setting a floor which all other Qualified Bids must exceed and, therefore, is entitled to be selected as the Purchaser. As a result, the Sellers have agreed that if the Sellers sell the Assets to a Successful Bidder other than the Purchaser, the Sellers shall, in certain circumstances, pay to the Purchaser a Break-Up Fee and an expense reimbursement equal to Purchaser's fees and expenses (up to an additional one-half percent of the Purchase Price) associated with negotiating the Agreement. The payment of the Break-Up Fee or the Expense Reimbursement (as applicable) shall be governed by the provisions of the Agreement and the Bidding Procedures Order.

(j)    <u>Conduct Of Auction</u>. If the Sellers receive at least one Qualified Bid in addition to the Agreement, the Sellers will conduct an auction (the "Auction") of the Assets at 10:00 a.m. (prevailing Eastern time) on June 13, 2008, in accordance with the procedures outlined in the Bidding Procedures which include: (i) attendance at the Auction will be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two business days prior to the Auction, each Qualified Bidder with a Qualified Bid must inform the Sellers whether it intends to participate in the Auction and at least one business day prior to the Auction, the Sellers will provide such bidders copies of the Qualified Bid which the Sellers believe is the highest or otherwise best offer for the Assets, (iii) all Qualified Bidders will be entitled to be present for all Subsequent Bids, and (iv) bidding at the Auction will begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $100,000, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

(k)    <u>Selection of Successful Bid</u>. As soon as practicable after the conclusion of the Auction, the Sellers will, in consultation with its financial advisor, the Committee and/or Sale Agent, review each Qualified Bid and identify the highest or otherwise best offer for the Assets (the "Successful Bid") and the bidder making such bid (the "Successful Bidder"). The Sellers will sell the Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "Sale Hearing").

(l)    <u>Sale Hearing</u>. The Sellers request that the Sale Hearing be scheduled for June 19, 2008 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing may be adjourned or rescheduled by the Sellers without notice other than by an announcement of the adjourned date at the Sale Hearing. If no Qualified Bids other than that of the Purchaser are received, the Sellers will proceed with the sale of the Assets to the Purchaser following entry of the order approving the Sale. If the Sellers receive additional Qualified Bids, then, at the Sale Hearing, the Sellers shall seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid" and such bidder, the "Alternate Bidder"). A bid will not be deemed accepted by the Sellers unless and until approved by the Bankruptcy Court. Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will effectuate a sale to the Alternate Bidder without further order of the Bankruptcy Court.

(m)    <u>Return Of Good Faith Deposits</u>. The Bidding Procedures provide that good faith deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open until two business days following the closing of the Sale (the "Return Date"). Notwithstanding the foregoing, the good faith deposit submitted by the Successful Bidder, together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder. If a Successful Bidder fails to consummate an approved sale, the Sellers will not have any obligation to return such good faith deposit and it shall irrevocably become property of the Sellers. On the

Return Date, the Sellers will return the good faith deposits of all other Qualified Bidders, together with the accrued interest thereon.

(n)     Reservation of Rights. The Sellers, after consultation with Signature, the Committee and/or the Sale Agent: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer, and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Sellers, their estates and creditors as determined by the Sellers in their sole discretion.

39.     In addition to the foregoing requirements, the Bidding Procedures provide for certain limited buyer protections. Specifically, the Bidding Procedures provide that in the event that Sellers terminate the Agreement prior to Closing, pursuant to sections 9.1(g) or 9.1(h) of the Agreement, Sellers shall pay to Purchaser an amount equal to three percent (3%) of the Purchase Price plus any fees and expenses incurred by Buyer as a result of negotiating the Agreement and the transactions contemplated hereby up to an additional one-half percent (0.5%) of the Purchase Price (together, the "Break-up Fee"). The Break-up Fee shall be paid within fifteen (15) days after termination of the Agreement.

40.     The Bidding Procedures propose that if the Sellers become obligated to pay the Purchaser the Break-up Fee, then such obligations shall constitute superpriority administrative expenses under sections 105, 503, and 507 of the Bankruptcy Code, with priority of payment senior to all other administrative expense claims, but junior to the liens and claims of the Senior Lender, which shall be paid from the proceeds of the auction to the extent one or more Qualified Bidders submit one or more overbids for the Assets and a transaction is consummated.

41.     The Debtors submit that implementation of the Bidding Procedures will not chill the bidding (if any) for the Assets. As set forth above, although the Debtors approached many parties to discuss the possible sale of the Assets, the Debtors did not receive any bids that were higher than the Purchaser's offer. Accordingly, the Debtors do not believe that at this juncture, given the Debtors' precarious financial situation and need to sell the Assets on an expedited basis, approval of the Bidding Procedures will chill any bidding. Quite to the contrary,

given the beneficial terms of the Agreement, approval of the Bidding Procedures is in the best interests of the Debtors, their estates and creditors in that it provides a structure and format for other potentially interested parties to formulate a bid for the Assets. Failure to approve the Bidding Procedures may jeopardize the Sale to the Purchaser to the detriment of the Debtors' creditors.

**H.      Notice Of Sale Hearing, Auction, Bidding Procedures, And Objection Dates.**

42.      As set forth in the Bidding Procedures, the Sellers seek to have the Sale Hearing set for June 19, 2008.

43.      Not later than three (3) days after the entry an Order approving this Motion, the Debtors will cause notices of the auction and sale, attached hereto as <u>Exhibit E</u> to be sent by first-class mail, postage prepaid, to (i) all of the Debtors' known creditors (including, without limitation Signature and Allied), (ii) all entities known to have expressed a *bona fide* interest in acquiring the Assets, (iii) any party known to have to assert a lien on any of the Assets, (iv) the Securities and Exchange Commission, (v) the Office of the United States Trustee, (vi) counsel for the Committee, all federal, state and local regulatory authorities with jurisdiction over the Debtors, (vii) the office of the United States Attorney for the Southern District of New York, (viii) all non-debtor parties to the Assumed Contracts and Assumed Leases, (ix) all parties who entered a notice of appearance and request for service of pleading pursuant to Fed. R. Bankr. P. 2002, and (x) any parties identified by the Sellers, Committee and/or Sale Agent as having an interest in bidding on the Assets.

**I.      Assumption And Assignment Of Contracts and Leases.**

44.      In addition, to facilitate the sale and the assumption and assignment of the Assumed Contracts and Assumed Leases, the Debtors propose to serve the a notice of assumption and assignment in the form annexed hereto as <u>Exhibit  F</u> and a notice of the  (the "Cure Amount Notice", attached as <u>Exhibit G</u> hereto), no later than five (5) days after the entry

of an Order approving this Motion and request that the Court approve the following procedure for fixing any cure amounts owed on all Assumed Agreements.

45.     The Debtors will attach to the Cure Amount Notice their calculation of the undisputed cure amounts that the Debtors believe must be paid to cure all prepetition defaults under all Assumed Contracts and Assumed Leases (the "Prepetition Cure Amounts"). The Debtors request if a non-debtor party to any Assumed Contracts and Assumed Leases disputes the Prepetition Cure Amount that such party be required to file an objection (the "Cure Amount Objection") on or before 4:00 p.m. (prevailing Eastern Time) three (3) days prior to the Sale Hearing (the "Cure Objection Deadline") and serve a copy of the Cure Amount Objection so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (i) counsel for the Debtors, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey 07068, Attention: Kenneth A. Rosen, Esq. krosen@lowenstein.com and Sharon L. Levine, Esq. slevine@lowenstein.com, S. Jason Teele, Esq. steele@lowenstein.com, and Kimberly Goldberg, Esq. kgoldberg@lowenstein.com, (ii) counsel for Signature Bank, Duane Morris LLP, 1540 Broadway, New York, NY 10036-4086, Attention: Laurence S. Hughes, Esq., lshughes@duanemorris.com, and Lawrence Kotler, Esq., lkotler@duanemorris.com, (iii) counsel for the Purchaser, Nixon Peabody LLP, 555 West Fifth Street, 46th Floor, Los Angeles, California 90013, Attention: David M. Tamman, dtamman@nixonpeabody.com, (iv) counsel to Allied Capital Corporation, Greenberg Traurig, LLP, 200 Park Ave., New York, New York 10166, Attention: Nancy A. Mitchell, Esq., MitchellN@gtlaw.com and John W. Weiss, Esq., WeissJW@gtlaw, (v) counsel for the Official Committee of Unsecured Creditors, _____, (vi) the proposed Sale Agent (if retained), Getzler Henrich & Associates, LLC, 295 Madison Avenue, New York, New York 10017, Attention: Mark Podgainey, mpodgainy@getzlerhenrich.com, and (vii) the United States Trustee for Region 2, 33 Whitehall Street, Suite 2100, New York, New York 10004, Attention: Greg Zipes, greg.zipes@usdoj.gov.

46.     In the event any such party fails to timely file and serve a Cure Amount Objection, such party shall (i) be forever barred from objecting to the Prepetition Cure Amount

and from asserting any additional cure or other amounts with respect to such Assumed Contracts and Assumed Leases and the Debtors shall be entitled to rely solely upon the Prepetition Cure Amount; and (ii) be deemed to have consented to the assumption and assignment of such Assumed Contracts and Assumed Leases and shall be forever barred and estopped from asserting or claiming against the Debtors, Purchaser or such other successful bidder or any other assignee of the relevant Assumed Contracts and Assumed Leases that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Assumed Contracts and Assumed Leases. The Purchaser shall be able to add or remove Assumed Contracts and Assumed Leases from the Schedule of Assumed Contracts and Assumed Leases up to ten (10) days prior to the Sale Hearing.

47.     In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth (i) the basis for the objection, and (ii) the amount the party asserts as the Prepetition Cure Amount. After receipt of the Cure Amount Objection, the Debtors will attempt to reconcile any differences in the Prepetition Cure Amount believed by the non-debtor party to exist. In the event, however, that the Debtors and the non-debtor party are unable to consensually resolve the Cure Amount Objection, the Debtors will segregate any disputed Prepetition Cure Amount pending the resolution of any such disputes by this Court or mutual agreement of the parties.

## LEGAL AUTHORITY

**A.      The Bankruptcy Code Permits The Debtors To Sell Assets To Preserve The Value Of Their Estates.**

48.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts have uniformly held that approval of a proposed sale of a debtor's assets outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that sound business reasons justify the transaction.

*See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); In *re Chateaugay Corp.*, 973 F.2d 141, 143-145 (2d Cir. 1992) (affirming the debtors' ability to sell "an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization"); *see also Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate outside the ordinary course of business if he has an articulated business justification.") (citations omitted); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986) ("… a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (elements necessary for approval of a § 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

49. Once the Debtors articulate a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotations omitted). The Debtors' business judgment "should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal citations omitted).

50. Additionally, courts have permitted a proposed sale of all or substantially all of a debtor's assets outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See generally*, *Abbotts Dairies*, 788 F.2d at 143; *Lionel*, 722 F.2d at 1063; *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir.), cert. denied, 419 U.S. 964 (1974) ("Other circuits have recognized the power of the bankruptcy court under chapter X to authorize a sale of the debtors' property under

less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets.").

51.     The proposed sale of the Assets pursuant to the Agreement and the Bidding Procedures described herein passes the "sound business reason" test. First, the Debtors submit that a prompt sale of the Assets by auction presents the best opportunity to realize the maximum value of the Assets for distribution to creditors. As previously discussed, prior to the Petition Date, the Debtors engaged in an extensive sale process led by its financial advisor. This process did not result in any offers being submitted for the Assets other than the offer presented in the Agreement. The Debtors further submit that the value of the Assets will decline absent a prompt sale, due to inadequate liquidity and necessary capital needed to continue operating the Debtors in the ordinary course of business and due to continuing operating losses and uncertainty about the future of the Debtors, all of which will result in loss of vendors, customers and revenue. *See Lionel*, 722 F.2d at 1071 (holding that the most important factor for court to consider in connection with a section 363(b) motion is whether assets are increasing or decreasing in value).

52.     Second, the Debtors believe that the Bidding Procedures are the best method by which they can provide interested persons with accurate and reasonable notice of the auction and potentially generate interest in the Assets by parties other than the Purchaser . Finally, the Purchase Price is fair and reasonable.

53.     The Bidding Procedures also satisfy the good faith requirement of the *Abbotts Dairies* test. As set forth above, the Debtors propose to serve the Bidding Procedures on, inter alia, to (i) all of the Debtors' known creditors (including, without limitation Signature and Allied), (ii) all entities known to have expressed a *bona fide* interest in acquiring the Assets, (iii) any party known to have to assert a lien on any of the Assets, (iv) all non-debtor parties to the Assumed Contracts and Assumed Leases, and (v) any parties identified by the Sellers, Committee and/or Sale Agent as having an interest in bidding on the Assets. By serving the

Bidding Procedures on these parties, the Debtors believe that any ensuing auction will yield the highest and best price for the Assets.

**B.      The Assets May Be Sold Free And Clear Of Liens, Claims And Encumbrances.**

54.      The Debtors further request that the Court authorize the sale of the Assets free and clear of all liens, encumbrances and interests which may be asserted against the Seller's assets (collectively, the "Liens and Claims"), with all such Liens and Claims to attach only to the proceeds of the transaction with the same priority, validity, force and effect as they now have in or against the Sellers' Assets. Signature consents to this sale. Thus, the sale of the Assets to the Purchaser free of all Liens and Claims should be approved by the Court.

55.      Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is sold is great that the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

56.      Therefore, section 363(f) permits the Debtors to sell the Assets free and clear of all Liens and Claims, except the Liens and Claims specifically assumed by the Purchaser or the Successful Bidder. Each Lien and Claim that is not the result of an assumed liability satisfies at least one of the five conditions of 11 U.S.C. § 363(f) (*i.e.*, Signature consents), and the Debtors submit that any such Lien and Claim will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may posses with

respect thereto. Accordingly, the Debtors request that the Assets be transferred to the Purchaser or the Successful Bidder free and clear of all Liens and Claims, except for the liens resulting from assumed liabilities, with such Liens and Claims to attach to the proceeds of the sale of the Purchased Assets.

## C. Good Faith Pursuant To § 363(m).

57. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

58. Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals in *In re Gucci* held that,

> the good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

126 F.3d at 390 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir.1978). *See also In re Andy Frain Services, Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986).

59. As previously discussed, the Agreement is the product of intensive negotiations in which the Purchaser has acted in good faith. While the Purchaser is owned by members of the Debtors' management team, the Debtors engaged in an extensive prepetition sale process led by the Debtors' financial advisor. The Debtors' financial advisor was extensively involved in the negotiation and terms of the Agreement. The Debtors therefore request that the Court make a finding that Purchaser has purchased the Assets and assumed the Assumed

Contracts and Assumed Leases in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**D.      Approval Of The Break-Up Fee And Expense Reimbursement.**

60.      Break-up fees and other forms of bidding protections encourage potential purchasers to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. *See*, *e.g.*, *In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"). The Debtors believe that approval of the Break-up Fee and, together with the procedures set forth in the Bidding Procedures, properly balances the Debtors' need to obtain the highest and/or otherwise best offer for the Assets while encouraging the Purchaser to act as a stalking horse. The Debtors believe that the Beak-up Fee is reasonable in the context of the Debtors' cases and the transaction contemplated by the Agreement.

61.      Courts in this District have established a three part test for determining when to permit bidding incentives. *See*, *e.g.*, *In re Integrated Resources, Inc.*, 147 B.R. 650, 657-658 (S.D.N.Y. 1992). The three factors are: "whether (1) relationship of parties who negotiated breakup fee is tainted by self-dealing or manipulation; (2) whether fee hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to purchase price."

62.      Here, the Break-Up Fee and Expense Reimbursement is not the product of self-dealing or manipulation. As set forth above, the Agreement is the culmination an extensive prepetition sale process. Moreover, the Break-Up Fee and Expense Reimbursement will encourage bidding for the Assets because, without them, the Debtors would not have a stalking horse and would be forced to conduct a blind auction. Finally, the Break-Up Fee and Expense Reimbursement is fair and reasonable in amount, particularly in view of the efforts to be made by the Purchaser and the risk to the Purchaser of being used as a stalking horse. Indeed, the

maximum amount of the Break-Up Fee (3.0% of the Purchase Price) and Expense Reimbursement (up to one half of one percent of the Purchase Price) not only constitutes a fair and reasonable percentage of a proposed purchase price, but also is customary for similar transactions of this type in the bankruptcy context. In addition, the payment of expenses and the indemnification and expense reimbursement provisions of the Agreement are reasonable given the significant investment in time and resources that the Purchaser will have contributed as the stalking horse bidder. Moreover, the amount of the proposed Break-Up Fee is within the range of breakup fees that have been approved by courts in this District. *See*, *e.g.*, *In re Allegiance Telecom, Inc.*, Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (2.8% break-up fee and expense reimbursement); *In re Enron Corp.*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2004) (3% break-up fee); *In re Loral Space & Communications Ltd.*, Case Nos. 03-41710 and 03-41709 (RDD) (Bankr. S.D.N.Y. 2003) (2% break-up fee and .8% expense reimbursement). Notwithstanding that certain shareholders and employees of the Debtors may participate in the ownership of the Purchaser, the financial partner - the party providing the capital to finance the transaction - desires and, under the circumstances, should be entitled to receive the bidding protections provided in the Agreement.

63.     In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." As described above, approval of the Bidding Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstances.

64.     The Debtors submit that granting administrative expense priority to the Break-up Fee is warranted under the circumstances here in that awarding fees of this type encourages potential buyers to invest the requisite time, money and effort to conduct due diligence and negotiations with a debtor despite the inherent risk and uncertainties of the chapter 11 process. *See*, *e.g.*, *In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. Jan. 12, 2007)

(Drain, J.); *In re Comdisco, Inc.*, Case No. 01-24795 (Bankr. N.D. Ill. Aug. 9, 2002) (approving a breakup fee as, *inter alia*, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement).

65. The Debtors' commitment to pay the Break-up Fee is an integral part of the purchase transaction contemplated under the Agreement, and the Purchaser would not act as the stalking horse without such commitment. Similarly, the Purchaser's offer provides a minimum bid on which other bidders can rely, thereby increasing the likelihood that the price at which the Assets will be sold will reflect their true value. Finally, the mere existence of the Break-up Fee permits the Debtors to insist that competing bids for the Assets be higher or otherwise better than the Purchase Price under the Agreement, a clear benefit to the Debtors' estates. For all the reasons set forth above, this fee is actual and necessary cost, not only for preserving the Debtors' estates, but also for maximizing the value of the Assets. Therefore, the payment of the Break-up Fee are actual, necessary costs of preserving the estate and should be entitled to administrative priority status under sections 503(b) and 507(a).

66. Accordingly, after careful analysis and in the exercise of their business judgment, the Debtors have determined, and respectfully submit, that, for all of the foregoing reasons, the relief requested in this Motion is in the best interests of the Debtors' estates and creditors – the transaction contemplated by the Agreement are a vital foundation for the Debtors to obtain maximum value for the Assets.

**E.     Assumption And Assignment Of The Executory Contracts And Unexpired Leases Is Permitted Pursuant To Section 365 Of The Bankruptcy Code.**

67. The assumption and assignment to the Purchaser of the Assumed Contracts and Assumed Leases is an integral part of the proposed sale and should be approved by the Court. Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume and assign an executory contract or unexpired lease subject to Court approval. Section 365(b) of

the Bankruptcy Court requires a debtor in possession to satisfy certain requirements at the time of assumption if a default exists under the contract to be assumed.

68.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). By enacting § 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate. *See Cinicloa v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *In re Sandman Assocs, LLC*, 251 B.R. 473, 481 (W.D. Va. 2000) (noting that "[t]he authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable and rejecting those that are not").

69.     It is well established that decisions to assume or reject executory contracts or unexpired leases are matters within the "business judgment" of the debtor. *See In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) (noting that "[i]n determining whether a debtor may be permitted to reject an executory contract, courts usually apply the business judgment test. Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business judgment will not be altered") (citations omitted). See also *Sharon Steel Corp. v. National Fuel Gas Dist Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984). Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986). Indeed, to impose more exacting scrutiny would slow a debtor's reorganization, thereby increasing its cost and undermining the "Bankruptcy Code's provisions for private control" of the estate's

administration. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

70. Adequate business justification exists to merit judicial approval of the proposed assumption and assignment of the Assumed Contracts and Assumed Leases. The Assumed Contracts and Assumed Leases are valuable assets of the Debtors' estates. To the extent that the Debtors can sell them to the Purchaser as part of the sale, the sales will generate cash which the estates can use to satisfy claims and reduce potential claims against the estates.

71. Based on the foregoing, the Debtors respectfully request that the Bankruptcy Court approve the assumption and assignment of the Assumed Agreements.

## FINALITY OF ORDER

72. The Debtors further seek, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the Court expressly provides that the effectiveness of any order approving of the sale and/or assumption and assignment of the Assumed Agreements not be stayed for any period of time after the entry of such order(s).

## NOTICE

73. Notice of this Motion has been given to (a) the Debtors' 20 largest unsecured creditors, (b) counsel for Signature Bank, (c) counsel for Allied Capital Corporation, (d) the Office of the United States Trustee (e) all entities known to have expressed a *bona fide* interest in acquiring the Assets; (f) taxing authorities; (g) lien holders; (h) the Securities and Exchange Commission; and (i) all non-debtor parties to Assumed Contracts and Assumed Leases The Debtors respectfully submit that such notice is sufficient, and request that this Court find that no further notice of the relief requested herein is required.

74. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

75.     No previous motion for the relief sought herein has been made to this or to any other court.

## WAIVER OF BRIEF

76.     As no novel issue of law is raised and the relevant authorities relied upon by the Debtors are set forth herein, the Debtors respectfully request that the requirement of the filing a brief be waived.

## CONCLUSION

77.     For all the foregoing reasons, the Debtors respectfully request the Court grant the relief requested in this Motion in all respects, and grant such other and further relief as is just and proper.


Dated:  March 31, 2008                              Respectfully submitted,

                                                    **LOWENSTEIN SANDLER PC**

                                                    By: */s/ Kenneth A. Rosen*
                                                    Kenneth A.  Rosen, Esq.  (KR-4963)
                                                    Sharon L.  Levine, Esq.  (SL-2109)
                                                    S.  Jason Teele, Esq.  (SJT 7390)
                                                    Kimberly Goldberg (KG 0117)
                                                    1251 Avenue of the Americas, 18th Floor
                                                    New York, New York 10020
                                                    (212) 262-6700 (Telephone)
                                                    (212) 262-7402 (Facsimile)

                                                    -and-

                                                    65 Livingston Avenue
                                                    Roseland, NJ 07068
                                                    Tel:  (973) 597-2500
                                                    Fax: (973) 597-2400

                                                    *Proposed Counsel to Debtors*
                                                    *and Debtors in Possession*