THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

Andrew I. Silfen
Schuyler G. Carroll
David J. Kozlowski
ARENT FOX LLP
1675 Broadway
New York, New York 10019
(212) 484-3900

Attorneys for Official Committee of Unsecured Creditors

-------------------------------------------------------- X

| | |
|---|---|
| In re | Chapter 11 |
| CREATIVE GROUP, INC., *et al.*, | Case No. 08-10975 (RDD) |
| Debtors. | (Jointly Administered) |

-------------------------------------------------------- X

### DISCLOSURE STATEMENT FOR JOINT LIQUIDATING PLAN FOR THE DEBTORS, CREATIVE GROUP, INC. *ET AL.*, PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Dated:　　June 28, 2010

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME. A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT UNDER BANKRUPTCY CODE § 1125 HAS BEEN SET BY THE BANKRUPTCY COURT FOR _____, 2010 AT __:00 A.M. THE CREDITORS' COMMITTEE RESERVES THE RIGHT TO MODIFY OR SUPPLEMENT THIS DISCLOSURE STATEMENT PRIOR TO AND UP TO THE DATE OF SUCH HEARING.

## INTRODUCTION

This disclosure statement (this "Disclosure Statement") is being furnished by the Official Committee of Unsecured Creditors (the "Creditors' Committee") of Creative Group, Inc., *et al.*, the debtors and debtors-in-possession in these Chapter 11 Cases ("Creative Group" or the "Debtors") in connection with the solicitation of votes to confirm the Joint Liquidating Plan for the Debtors, Creative Group, Inc., *et al.*, Proposed by the Official Committee of Unsecured Creditors (the "Plan") pursuant to Chapter 11, Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). A copy of the Plan is attached hereto as <u>Exhibit A</u>.[1]

The Debtors in these cases are Creative Group, Inc., Animagic LLC, Fangoria Entertainment, Inc., Moe Greene Entertainment LLC, Nate the Great LLC, Starlog Entertainment, Inc., Starlog Group, Inc., Starlog Licensing of America, Inc., and Tangerine LLC.

The purpose of this Disclosure Statement is to set forth adequate information: (1) regarding the history of the Debtors, their business, operations, financial condition, and assets and these Chapter 11 Cases; (2) concerning the Plan and alternatives to the Plan; (3) advising the holders of Claims and Equity Interests of their rights under the Plan; (4) assisting the holders of Claims entitled to vote in making an informed judgment regarding whether they should vote to accept or reject the Plan; and (5) assisting the Bankruptcy Court in determining whether the Debtors have complied, and the Plan complies, with the provisions of Chapter 11 of the Bankruptcy Code.

By Court order dated _____ (the "Disclosure Statement Order," a copy of which is attached hereto as <u>Exhibit B</u>), the Bankruptcy Court: (i) approved this Disclosure Statement, in accordance with Bankruptcy Code § 1125, as containing "adequate information" to

---

[1] Capitalized terms that are not defined in this Disclosure Statement shall have the meanings set forth in the Plan.

enable a hypothetical, reasonable investor typical of holders of Claims against, or Equity Interests in, the Debtors, to make an informed judgment as to whether to accept or reject the Plan; and (ii) authorized its use in connection with the solicitation of votes with respect to the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. No solicitation of votes may be made except pursuant to this Disclosure Statement and Bankruptcy Code § 1125. In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtors and its business, other than that contained in this Disclosure Statement and the Plan and the exhibits hereto and thereto.

THE CREDITORS' COMMITTEE STRONGLY RECOMMENDS THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THE PLAN REPRESENTS A LEGALLY BINDING ARRANGEMENT AND SHOULD BE READ IN ITS ENTIRETY, AS OPPOSED TO RELYING ON THE SUMMARY PROVIDED HEREIN. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS IN THEIR ENTIRETY FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN. NO STATEMENTS OR INFORMATION CONCERNING THE DEBTORS OR THEIR ASSETS OR SECURITIES ARE

AUTHORIZED, OTHER THAN THOSE SET FORTH HEREIN.  ANY REPRESENTATIONS MADE IN ORDER TO SECURE AN ACCEPTANCE OF THE PLAN THAT ARE NOT CONTAINED HEREIN ARE TO BE REPORTED TO THE CREDITORS' COMMITTEE, THE UNITED STATES TRUSTEE AND THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF BY THE DEBTORS UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE.  THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE CREDITORS' COMMITTEE.  ALL FINANCIAL INFORMATION IN THIS DISCLOSURE STATEMENT IS UNAUDITIED, BUT THE CREDITORS' COMMITTEE HAS MADE REASONABLE EFFORTS UNDER THE CIRCUMSTANCES TO PROVIDE ACCURATE INFORMATION IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ THE DISCLOSURE STATEMENT CAREFULLY AND IN ITS ENTIRETY AND, WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, WHICH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF THE PLAN SHALL CONTROL.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD-LOOKING

FORECASTS AND ARE BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

The Plan is a liquidating "reallocation plan" meaning that Signature, the Debtors' secured creditor, agreed to reallocate and contribute at least $250,000.00 (the "Committee Settlement Amount") of its collateral to be distributed to holders of Allowed General Unsecured Claims. The Committee Settlement Amount will likely allow for a meaningful distribution due to the fact that General Unsecured Claims total less than $1.7 million. In addition to the Committee Settlement Amount, there may be additional distributions from recoveries from estate causes of action, including claims under Chapter 5 of the Bankruptcy Code, which will be distributed *pro rata* to all Allowed Claims.

The Creditors' Committee believes, but cannot be certain, that the Bankruptcy Estates will have sufficient funds to pay Administrative Claims and Tax and Non-Tax Priority Claims in full on the Effective Date. If there are insufficient funds available to pay Administrative Claims and Tax and Non-Tax Priority Claims in full, then the Plan cannot be confirmed. If the Plan is not confirmed, either because there are insufficient funds to pay Administrative and Priority Claims or because the holders of Claims entitled to vote on the Plan withhold their consent, then there will likely be no distribution to General Unsecured Creditors.

## A. Holders of Claims and Equity Interests Entitled to Vote

In these Chapter 11 Cases, Class 1 and Class 2 are impaired, but agreed to certain treatment of their claims under the Plan. Holders of Claims in Class 1 and Class 2 are entitled to vote on the Plan. Holders of Claims in Class 3 are impaired by the Plan and, therefore, are entitled to vote to accept or reject the Plan. Class 4 is comprised solely of holders of Equity

Interests, which will receive no distribution and retain no property under the Plan and, therefore, is deemed to have rejected the Plan.

**B.    Voting Procedures**

If you are entitled to vote to accept or reject the Plan, enclosed is a ballot (the "Ballot") for the acceptance or rejection of the Plan and a pre-addressed envelope for the return of the Ballot.    BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN. Such Claimants should read the Ballot carefully and follow the instructions contained therein. Please use only the official Ballot (or Ballots) that accompanies this Disclosure Statement.    If you are the holder of a Class 1, 2, or 3 Claim and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, any of the exhibits hereto, the Plan or the voting procedures in respect thereof, please contact counsel to the Creditors' Committee:

> Schuyler G. Carroll
> ARENT FOX LLP
> 1675 Broadway
> New York, NY 10019
> Telephone: (212) 484-3900
> Facsimile: (212) 484-3990

After carefully reviewing this Disclosure Statement and the exhibits attached hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and return it either by overnight courier or regular mail in the envelope provided.    BALLOTS SUBMITTED BY FACSIMILE OR OTHER ELECTRONIC TRANSMISSION WILL NOT BE ACCEPTED AND WILL BE VOID.    Voting requirements are explained elsewhere in this Disclosure Statement.    PLEASE VOTE AND RETURN YOUR BALLOT TO COMMITTEE COUNSEL AT THE AFOREMENTIONED ADDRESS.    IN ORDER TO BE COUNTED, BALLOTS

MUST BE RECEIVED NO LATER THAN 4:30 P.M. (PREVAILING EASTERN TIME) ON _____, 2010.  ANY EXECUTED BALLOTS THAT ARE TIMELY RECEIVED BUT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED.

If you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any of the exhibits, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please submit your request to Arent Fox LLP, Attention: Schuyler G. Carroll, at the foregoing address.

Any creditor with a claim to which an objection has been filed may not vote on the Plan unless the claim has been temporarily allowed for voting purposes.  Temporary allowance of a claim shall be sought in accordance with the procedures set forth herein and in the Plan.  The Creditors' Committee believes that prompt confirmation and implementation of the Plan is in the best interests of all Claimants.

## C.    Confirmation Hearing

In accordance with the Disclosure Statement Order and Bankruptcy Code § 1128, a hearing on confirmation of the Plan (the "Confirmation Hearing") will be held on _____, 2010, at __:00 a.m. (Prevailing Eastern Time), in the United States Bankruptcy Court for the Southern District of New York – White Plains, 300 Quarropas Street, White Plains, NY 10601, before the Honorable Robert D. Drain to consider confirmation of the Plan.  Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before _____, 2010 at 4:00 p.m. (Prevailing Eastern Time) in the manner set forth in the Disclosure Statement Order.  The Confirmation Hearing may be

adjourned from time to time without further notice except for the announcement of the adjourned date and time at the Confirmation Hearing or any adjournment thereof.

## ARTICLE I.
## OVERVIEW OF PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article IV below, entitled "The Liquidating Plan."

On the Confirmation Date, the Debtors must be in possession of sufficient funds to satisfy Allowed Administrative Claims, Non-Tax Priority Claims, and Priority Tax Claims for the Plan to be confirmed. If the Debtors have insufficient funds to meet those obligations, absent a compromise with holders of Allowed Administrative Claims, Non-Tax Priority Claims, and Priority Tax Claims, the Plan cannot be confirmed and the General Unsecured Creditors will not receive any distribution.

The Plan has been made possible as a result of the sale of substantially all of the Debtors' operating assets and the agreement of Signature to reallocate and contribute, *inter alia*, the Committee Settlement Amount. Absent Signature's agreement to reallocate the Committee Settlement Amount, all of the Assets would have been payable to Signature. In addition to the Committee Settlement Amount, certain of the Debtors' Assets, including Rights of Action (including Avoidance Actions but excluding Insider Avoidance Actions), that were excluded from the sale of the Debtors' assets will be transferred to the Creditor Trust and will be used to fund the Plan.

The Creditor Trust will be established on the Effective Date to hold the Trust Assets for the benefit of holders of Allowed General Unsecured Claims pursuant to the terms of the Plan and the Creditor Trust Agreement and for the purposes set forth in the Plan and in the

Confirmation Order. Substantially all of the Debtors' operating assets have been sold and reduced to Cash. In addition to the Committee Settlement Amount, those Assets not sold will be transferred to the Creditor Trust for administration by the Creditor Trustee. The Creditor Trust will reduce the unliquidated Trust Assets to Cash and will distribute the Trust Assets with the exception of the Committee Settlement Amount, Pro Rata, to holders of Class 1, Class 2 and Class 3 Claims. The Committee Settlement Amount will be distributed Pro Rata only to holders of Class 3 Claims. The Creditor Trustee also will administer the Wind Down Fund of at least $100,000.00 to satisfy any outstanding expenses of the Debtors' Estates, the remainder of which shall be turned over to the Creditor Trust.

Under the Plan, the Creditor Trust will be established and will hold Trust Assets for the benefit of holders of Allowed General Unsecured Creditors. After the Effective Date, the Creditor Trustee selected by the Creditors' Committee will manage the Creditor Trust pursuant to the terms of the Plan and the Creditor Trust Agreement and for the purposes set forth in the Plan and Confirmation Order. In addition, the Creditor Trustee will be authorized to pursue claims belonging to the Debtors and the Bankruptcy Estate for the benefit of holders of Allowed General Unsecured Claims. Holders of Allowed General Unsecured Claims will receive a proportionate share of the assets in the Creditor Trust available for distribution. The percentage recovery for each such Claimant will depend on the Cash in the Creditor Trust, the Creditor Trustee's success in pursuing Rights of Action, objections to Claims and Avoidance Actions on behalf of the Creditor Trust, the expenses incurred by the Creditor Trustee in administering the Creditor Trust and the aggregate amount of Allowed General Unsecured Claims.

## A. Summary of Classification and Treatment of Claims and Equity Interests Under the Plan

The Plan classifies all Claims and Equity Interests of the Debtors into separate classes (each a "Class"). The following chart summarizes the classification and status of Claims and Equity Interests and the treatments afforded under the Plan. The Bar Date for filing Proofs of Claim was June 12, 2008, for non-governmental entities and September 17, 2008, for governmental entities. The Creditors' Committee is in the process of analyzing the validity of all claims filed in these Chapter 11 Cases. Until this process is complete, the Creditors' Committee will not be able to state with certainty any estimated or projected distributions to unsecured creditors. Based on the amount of claims filed to date, however, the projected recoveries are as follows:

| Class | Claim/ Interest | Treatment of Claim/Interest | Amount of Filed and Scheduled Claims or Equity Interests | Projected Recovery |
|---|---|---|---|---|
| 1 | Unsecured Claim | Signature shall receive: (a) the first $45,000.00 of the Net Avoidance Action Proceeds; and (b) a Pro Rata share of all Trust Assets. | Scheduled Claims: Approximately $60,000.00 | Unknown |
| 2 | Unsecured Claim | Allied shall receive: (a) $30,000.00 of the Net Avoidance Action Proceeds solely to the extent that Signature first receives $45,000.00 of the Net Avoidance Action Proceeds; and (b) a Pro Rata share of all Trust Assets, except the Committee Settlement Amount, in full and final satisfaction of the Allied Allowed Claim. | Scheduled Claims: $16,559,260.16 | Unknown |
| 3 | Unsecured Claims | All Class 3 Claimants shall share Pro Rata in: (a) the Committee Settlement Amount; and (b) all other Trust Assets. | Scheduled and filed claims: Approximately $1,656,685.44 | Approximately 15% |
| 4 | Equity Interests | No distribution or retention of property under the Plan. | | None |

THE TREATMENT AND DISTRIBUTIONS PROVIDED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE PLAN ARE IN FULL AND COMPLETE

SATISFACTION OF THE ALLOWED CLAIMS ON ACCOUNT OF WHICH SUCH TREATMENT IS GIVEN AND DISTRIBUTIONS ARE MADE. NOTHING IN THE PLAN LIMITS THE ABILITY OF THE DEBTORS TO PAY ADMINISTRATIVE EXPENSE CLAIMS THAT ARE NOT DISPUTED BEFORE THE EFFECTIVE DATE.

ANY PARTY WHO DOES NOT OBJECT TO THIS DISCLOSURE STATEMENT IS NOT DEEMED TO WAIVE ANY RIGHTS TO OBJECT TO THE CONFIRMATION OF THE PLAN ON ANY BASIS, OTHER THAN LACK OF ADEQUATE DISCLOSURE UNDER BANKRUPTCY CODE § 1125.

## ARTICLE II.
## GENERAL INFORMATION

**A.      Description of the Debtors' Business and History**

Prior to commencing these Chapter 11 Cases on March 21, 2008, (the "Filing Date"), the Debtors conducted business as a diversified entertainment and media company producing live action, animation, sound design, sound mixing and recording, and broadcast design for the television and film industries. The Debtors' services spanned all media types with operations comprising the entire spectrum of concept development through creative implementation, production, post-production, and distribution. The Debtors were well known for their award-winning work on behalf of cable and broadcast networks owned by international media companies such as The Walt Disney Company (ESPN, ABC, The History Channel, A&E), Viacom (CBS, MTV, VH-1, Nickelodeon, Spike), General Electric (NBC, MSNBC), Comcast Cable (Versus), and Time Warner (Time Warner Cable).

In recent years, the Debtors embarked on an aggressive program of original content property development. These assets include animated series, live action features, documentaries, television and radio programming, web content, and magazine publishing. For the purposes of

cross-promotion and brand extension, the Debtors made significant investments in entertainment properties and marketing capabilities, movies and television productions, genre fan magazines, web sites, brand management and marketing expertise, graphic design, and advertising capabilities.

**B.        Prepetition Indebtedness and Capital Structure**

Creative Group was a private corporation with thirteen (13) shareholders holding the approximately 1.5 million shares of stock outstanding.  As of the Petition Date, the Debtors were indebted to Signature Bank ("Signature") in the aggregate principal amount of approximately $16,559,260.16 (the "Signature Loan"), pursuant to (i) a credit agreement dated as of September 28, 2006 by and among Signature and Creative Group, Inc. (the "Credit Agreement); (ii) a term note dated as of September 28, 2006 in the aggregate principal amount of $15,000,000 executed by Creative Group, Inc., in favor of Signature (the "Term Note"); and (iii) a revolving credit note dated as of September 28, 2006 in the aggregate principal amount of $3,000,000 executed by Creative Group, Inc., in favor of Signature (the "Revolving Note" and, together with the Credit Agreement and Term Note, the "Prepetition Credit Documents").

Pursuant to two separate guarantee agreements (collectively, the "Guarantee") each dated as of September 28, 2006, each of the Debtors guaranteed the obligations of Creative Group, Inc. to Signature under the Prepetition Credit Documents, and Joseph V. Avallone, the Debtors' principal, guaranteed the obligations of Creative Group, Inc. up to $6 million.  The Debtors' obligations to Signature under the Prepetition Credit Documents were secured by substantially all of their assets pursuant to a security agreement dated as of September 28, 2006.  The Debtors used the proceeds of the Signature Loan to fund their working capital requirements.

Additionally, as of the Petition Date, the Debtors were indebted to Allied Capital Corporation ("Allied") in the aggregate principal amount of approximately $15,000,000 pursuant

to a 12% subordinated secured note dated as of September 12, 2006 and executed by Creative Group, Inc., Fangoria Entertainment, Inc., Moe Greene Entertainment, LLC, Tangerine, LLC, Animagic, LLC and Nate The Great, LLC in favor of Allied (the "Subordinated Note"). The Subordinated Note was secured by substantially all of the Debtors' assets pursuant to a prepetition security agreement by and among Allied and the Debtors. Allied's security interests in and liens upon the Debtors' assets are subordinated to Signature's liens and security interests pursuant to a Subordination and Intercreditor Agreement dated as of September 28, 2006. The Debtors used the proceeds of the Subordinated Note to develop the Nate the Great animated series in partnership with PBS, to acquire the Fangoria and Starlog magazines and related properties, and to expand into other intellectual properties (such as the development of feature length films and a radio program for Sirius Satellite Radio).

In addition to amounts owing to Allied and Signature, the Debtors had approximately $1.1 million in outstanding obligations to trade vendors as of March 18, 2008.

C.      **Events Leading To Debtors' Chapter 11 Filings**

1.      **The Debtors' Financial Difficulties**

In 2005, the Debtors received a commitment from PBS to develop the Nate the Great children's books into an animated television series. PBS committed to an initial order of forty (40) animated episodes. In addition, PBS committed to financing approximately $3,000,000 of the production budget. The initial production budget was approximately $17,000,000.

In November, 2004, the Debtors entered into an installment agreement with Starlog Group, Inc. to purchase all of the stock of the company. The installment agreement required the Debtors to pay $40,000 per month for 12 months; $60,000 per month for the next 12 months; $100,000 per month for the next 12 months; and $200,000 per month for the final 12 months.

The Debtors had the right to cancel the installment agreement at the end of 24 months with all payments made through that date retained by Starlog Group, Inc. as licensing fees.

In 2005, the Debtors retained Banc America Securities ("Banc America") as their investment banker to help raise $20,000,000 of financing to support the Debtors' development of the Nate the Great series and fund the acquisition of Starlog Group, Inc. Banc America solicited many investors but were unsuccessful in securing the $20,000,000 private placement. Subsequently, the Debtors retained JDM Partners as their investment banker. JDM Partners received term sheets from two prospective investors: Peppertree Capital and Allied. The Debtors selected the Peppertree Capital proposal because Peppertree Capital was willing to commit to $15,000,000 while Allied Capital was willing to commit only $12,000,000.

When the Debtors could not close the commitment with Peppertree Capital, they re-solicited Allied, and the parties negotiated and then entered into the Subordinated Note. The proceeds of the Subordinated Note were used to fund the Debtors' development of the Nate the Great series, immediately pay off the remaining installments to complete the acquisition of Starlog Group, Inc., continue production of a radio program for Sirius Satellite Radio, and begin the development of a feature film relationship with a major studio. However, production delays, production costs in excess of budgeted amounts and the opportunity costs associated with focusing on these properties to the exclusion of the Debtors' core service business caused a decline in revenue. In addition, royalty revenues were below original projections. As a result, the Debtors found themselves unable to service both the Signature and Allied debt.

In response to their liquidity crisis, the Debtors halted production on their Nate the Great property and feature film development efforts. When the Debtors' efforts to reverse the severe liquidity shortfalls failed, they took the necessary step of filing for Chapter 11 protection to

stabilize their day-to-day operations, avail themselves of the financing provisions of the Bankruptcy Code, and protect and preserve the value of their assets for the benefit of their creditors.

**2.      The Debtors' Prepetition Efforts To Sell The Assets**

Prior to the Filing Date, the Debtors, in consultation with Signature, retained Cantor Advisors to provide restructuring alternatives.  Upon consultation with Cantor Advisors in mid-May 2007, the Debtors spent four months attempting to restructure their obligations to Signature and Allied.  When restructuring efforts eventually failed, the Debtors determined that a sale of their assets provided the best hope for a recovery.

Prepetition, the Debtors solicited offers from approximately 45 financial and strategic potential buyers. In August and September of 2007, Cantor Advisors and the Debtors' management sent teasers and calls to approximately 25 parties who are known to invest in special situations. Five (5) of these parties were interested and completed due diligence over the next several months. At the end of this process, the highest and best offer was submitted by Scorpion Capital Partners, L.P. ("Scorpion Capital"). In January 2008, an additional 20 special situation investors were contacted to determine if a higher bid could be obtained. No other party submitted an offer that was higher or better that Scorpion Capital's offer.

Between June 2007 and August 2007, the Debtors also solicited buyers, and ultimately reached an agreement with Riverlight Productions, Inc. for sale of the Debtors' Nate the Great assets. However, during the due diligence process, completed between September 2007 and November 2007, Riverlight Productions determined that it was dissatisfied with the original license of the Nate the Great assets from the original author. After unsuccessful negotiations with the original author, Riverlight Productions chose not to complete the acquisition.

Thus, prepetition, the Debtors and their financial advisor undertook extensive efforts to sell the Debtors' assets for the highest price and under the most favorable terms. After soliciting approximately 45 potential buyers and coordinating due diligence with several of them, the Debtors determined that Scorpion Capital's offer was superior. The Debtors then negotiated with Scorpion Capital for its offer to be used as a stalking horse bid in any ensuing auction conducted under the auspices of this Court. After agreeing to the bid protections (described below), Scorpion Capital agreed to be the stalking horse bidder.

## ARTICLE III.
## HISTORY OF THE DEBTORS' BANKRUPTCY CASE

### A.    General

#### 1.    Filing of Petition

On March 21, 2008, the Filing Date, the Debtors commenced voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors continue to manage their affairs as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108. No trustee or examiner has been appointed in these Chapter 11 Cases.

Since the Filing Date, the Debtors have been engaged in: (i) operating their business as debtors-in-possession under the Bankruptcy Code (until the sale of substantially all of their business assets); (ii) administering, managing, and coordinating the Chapter 11 Cases; (iii) achieving a sale of their assets under Bankruptcy Code § 363 (the "Bankruptcy Sale"); (iv) winding down their businesses and operations and liquidating those assets of the Debtors not sold as part of the Bankruptcy Sale; and (v) developing a plan of liquidation under which the proceeds from the Bankruptcy Sale and other sales of the Debtors' assets will be distributed to holders of Claims pursuant to the Bankruptcy Code.

## 2. First Day Orders

Concurrently with the filing of their Chapter 11 petitions, the Debtors filed certain applications, and proposed orders (collectively, the "First Day Orders") to help ensure the efficient administration of the Chapter 11 Cases. These customary First Day Orders were entered after various hearings before the Bankruptcy Court on March 26, 2008 and thereafter. The First Day Orders included: (i) an order granting joint administration for procedural purposes only; (ii) an order authorizing the Debtors to continue and maintain their consolidated existing cash management system, continue and maintain their existing bank accounts and use existing business forms; (iii) an order authorizing the payment of prepetition claims of certain critical vendors; (iv) an order allowing the Debtors to pay prepetition wages and salaries and related taxes and directing all banks to honor checks for payment of prepetition employee obligations; (v) an interim order authorizing the Debtors to obtain postpetition financing, granting security interests, authorizing use of cash collateral, and granting adequate protection; (vi) an order authorizing the Debtors to employ Administrar Services Group LLC as noticing and claims agent and approving related agreement; (vii) an order granting the Debtors' application to employ Lowenstein Sandler P.C. ("Lowenstein") as its bankruptcy counsel; (viii) an order authorizing the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of business; (ix) an order deeming utility companies to have adequate assurance of payment, prohibiting utility companies from discontinuing, altering or refusing service, and establishing procedures for resolving requests for additional assurance; (x) an order granting the Debtors' application to employ Cantor Advisors as consultants to the Debtors; and (xi) an order establishing procedures for monthly compensation and reimbursement of expenses of professionals.

### 3. Cash Collateral and Financing Motion

As part of its First Day Motions, on March 22, 2008 the Debtors filed a motion seeking Bankruptcy Court approval for its use of cash collateral and post-petition financing from Signature. The Bankruptcy Court granted use of cash collateral and post-petition financing on an interim basis by orders entered on March 26, 2008, April 16, 2008, and April 23, 2008, and a final stipulation and order authorizing the Debtors' use of cash collateral and post-petition financing was entered on May 9, 2008 (collectively, the "Cash Collateral Order"). The Cash Collateral Order authorized, among other things, the Debtors to use cash collateral in accordance with the cash collateral budget and required Signature to fund all amounts due under the cash collateral budget and other amounts notwithstanding the termination of the use of cash collateral. The Cash Collateral Order also included a carve-out for professional fees and required Signature to pay all fees due to the Bankruptcy Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b).

### 4. Other Motions

The Debtors also filed motions to assume and reject unexpired leases and executory contracts and noticed cure amounts ("Cure Notice") for the assumption of some such leases. In response to the Cure Notice, various landlords filed responses objecting to the proposed cure amounts stated therein, all of which have been resolved.

The Debtors also filed a motion (the "Rejection Motion") to reject certain employment agreements and vehicle leases and to set a bar date for the filing of claims for rejection damages. Certain counterparties to the employment agreements filed objections to the Rejection Motion which were overruled by the Court, which entered an order granting the relief sought in the Rejection Motion on July 21, 2008.

**B.** **The Debtors' Professionals**

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent their interests in these Chapter 11 Cases, with authorization from the Bankruptcy Court, the Debtors employed Lowenstein Sandler P.C. as bankruptcy counsel and Cantor Advisors as their financial advisor.

The Debtors also employed several other accountants and attorneys as "ordinary course professionals" pursuant to an order entered on April 15, 2008. These ordinary course professionals included Daniel Gammerman, Esq. as General Corporate Counsel, Chapman and Zaransky to pursue landlord tenant issues on behalf of the Debtors, Marcum & Kliegman LLP to provide audit, tax and consulting services, and Rosner, Nocera and Ragone LLP to provide legal services related to property damage resulting from a fire.

**C.** **The Creditors' Committee and Its Professionals**

On April 4, 2008, the Office of the United States Trustee appointed the Creditors' Committee to represent the interests of the Debtors' unsecured creditors in these Chapter 11 Cases. Following its formation, the Debtors consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases, the sale of the Debtors' assets and other issues arising in the Chapter 11 Cases. The Creditors' Committee, through its advisors, participated actively with the Debtors' management and professionals in, *inter alia*, negotiating the terms of the sale of the Debtors' assets and the Plan.

The members of the Creditors' Committee and its attorneys and advisors are as follows:

*Committee Members:*

RR Donnelley & Sons, Inc.
3075 Highland Pkwy
One Jack Curran Way
Downers Grove, IL 60515
Attention: Dan Pevonka

Empress Media, Inc.
306 W. 38th Street, 9th Floor
New York, NY 10018
Attention: David Miller

Norman Bobrow & Co.
331 Madison Avenue, 7th Floor
New York, NY 10017
Attention: Charles Shamash

*Counsel to the Creditors' Committee*

Andrew I. Silfen
Schuyler G. Carroll
David J. Kozlowski
Arent Fox LLP
1675 Broadway
New York, NY  10019
*Financial Advisor to the Creditors' Committee*

Allen Wilen
Amper, Politziner & Mattia, P.C.
2015 Lincoln Highway
Edison, NJ 08818-0988

**D.     Schedules and Statements**

On April 8 and 9, 2008, the Debtors filed their schedules of assets and liabilities and statement of financial affairs with the Bankruptcy Court.  On May 9 and May 21, 2008, the Debtors filed amended schedules of assets and liabilities, to correct and clarify certain information included in, or omitted from, the original schedules and statements (as amended, the "Schedules").

**E.     Bar Date Order**

On May 2, 2008, the Bankruptcy Court entered an order (the "Bar Date Order") establishing June 12, 2008 (the "Bar Date"), as the date by which all proofs of claim, with the

exception of those asserted by governmental entities, were required to be filed, or be barred from asserting any claim against the Debtors and from voting upon or receiving distributions. Proofs of claim were not required to be filed at that time by the following parties: (a) any person or entity that already filed a proof of claim against the Debtors with the Clerk of the Bankruptcy Court for the Southern District of New York in a form substantially similar to Official Bankruptcy Form No. 10; (b) any person or entity whose claim is listed on the Schedules filed by the Debtors, provided that (i) the claim is not scheduled as "disputed," "contingent," or "unliquidated;" and (ii) the claimant does not disagree with the amount, nature, and priority of the claim as set forth in the Schedules (the "Schedules"), and (iii) the claimant does not dispute that the claim is an obligation of the specific Debtor against which the claim is listed in the Schedules; (c) any holder of a claim that heretofore has been allowed by Order of the Court; (d) any person or entity whose claim has been paid in full by any of the Debtors; (e) any holder of a claim for which specific deadlines have previously been fixed by this Court; (f) any Debtor having a claim against another Debtor or any of the non-debtor subsidiaries of Creative Group, Inc., having a claim against any of the Debtors; or (g) any holder of a claim that is allowable under Sections 503(b) and 507(a)(2) of the Bankruptcy Code as an expense of administration. The Bar Date Order also provides a separate bar date of September 17, 2008 for governmental units (the "Governmental Bar Date").

Pursuant to the Bar Date Order, any person or entity or governmental unit that holds a claim that arises from the rejection of an executory contract or unexpired lease, as to which the order authorizing such rejection is dated on or before the entry of this Order, must file a proof of claim based on such rejection on or before the Bar Date, and any person or entity that holds a claim that arises from the rejection of an executory contract or unexpired lease, as to which an

order authorizing such rejection is dated after the date of entry of this Order, must file a proof of claim on or before such date as the Court may fix in the applicable order authorizing such rejection.

**F.      Sale of Substantially All of the Debtors' Assets**

**1.      The Debtors' Postpetition Due Diligence Process**

After the Petition Date, the Debtors continued their efforts to market their assets.  To guarantee that interested parties received diligence materials without interference from the Debtors or their management (some of whom are affiliated with Scorpion Capital) the Debtors placed control of the diligence process in the hands of the Committee.  By placing the diligence process under the control of the Committee, the Debtors intention was to eliminate any appearance of impropriety or manipulation that may otherwise have been alleged to be present due to involvement of some of the Debtors' insiders with Scorpion Capital (as discussed below).

Prior to the Petition Date, the Debtors negotiated an asset purchase agreement (the "Agreement") with an entity to be formed for the purpose of acquiring the Debtors' assets (the "Purchaser" or "Newco"), a newly formed entity owned and controlled by Scorpion Capital and certain shareholders and employees of the Debtors.

The Agreement is the culmination of the Debtors' prepetition marketing process (discussed above) and months of negotiations to restructure or refinance the Debtors' prepetition debt. Because the value of the Debtors' business and assets is inextricably tied to the creative talent and client contacts of its existing employees, including, in particular, the Debtors' senior management, it became apparent that outside buyers would not likely be willing to pay an amount equal to the amounts owing to Signature (as the holder of the Debtors' senior secured debt) simply for the assets with new management. As previously discussed, despite the Debtors' prepetition marketing efforts, no other party submitted an offer to purchase the Debtors' assets

on terms that would fully satisfy the Signature debt. Signature, which was also the Debtors' postpetition lender, agreed to restructure the prepetition debt as a second lien, junior to the new financing to be provided to the Purchaser by PNC Business Credit at the closing of the proposed sale transaction.

### 2. The Debtors' Sale of Substantially all Assets

On March 31, 2008, shortly after the Petition Date, the Debtors filed an application requesting entry of an order of the Bankruptcy Court: (a) approving proposed bidding procedures, certain bid protections, the form and manner of sale notices, and setting a hearing date; and (b) authorizing and approving the sale of substantially all of the Debtors' assets free and clear of liens, claims, and encumbrances to the Purchaser or to the successful bidder submitting a higher or otherwise better bid, the assumption and assignment of certain executory contracts and unexpired leases, and the assumption of certain liabilities by the Purchaser or the Successful Bidder (the "Sale Motion"). On April 23, 2008, the Court entered an order granting the relief requested in the Sale Motion and setting a hearing on the proposed sale of the Debtors' Assets to Newco for June 19, 2008.

Initially, the Committee objected to the proposed sale of the Debtors' assets as it provided no value for the unsecured creditors and little information was provided as to the marketing efforts undertaken, the valuation of the assets to be sold, and the financial wherewithal of the Purchaser to perform. The Committee was further concerned about the lack of a clear purchase price stated in the Sale Motion and the provision of a break-up fee in the context of a sale to insiders.

As a result of the Committee's expressed concerns and significant negotiation with the Debtors, the Asset Purchase Agreement was revised to provide that consideration for the purchase of the Debtors' assets would include cash to be paid to Signature in the aggregate

amount of $14,044,000.00, less $250,000.00 to be reallocated to the Committee (the "Committee Settlement Amount"), $750,000.00 to be reallocated to Allied (the "Allied Settlement Amount"), and cure costs not to exceed $744,830.00 (together, the "Aggregate Cash Consideration"). The consideration for the purchase further included a term note in the aggregate amount not to exceed $3,650,000.00 by Newco in favor of the Signature equal to the difference between the Aggregate Cash Consideration and the amounts owed, by any or all of the Sellers, to Signature as both Senior Secured Lender and DIP Lender. Further, Avoidance Actions, Rights of Action, and other Excluded Assets were reserved, at least in part, for the benefit of unsecured creditors.

An auction was scheduled for June 13, 2008; however, because Newco was the only qualified purchaser under the bidding procedures who made an offer for the Debtors' assets, no auction was held. Accordingly, the Bankruptcy Court entered an order authorizing the sale of the Debtors' assets to Newco on June 30, 2008.

As a result of the Creditors' Committee's efforts, in addition to re-allocating the Contributed Assets for distribution to Allowed General Unsecured Creditors, Signature agreed to assume or fund various administrative and priority expenses of the Debtors as part of the sale and the final order authorizing use of cash collateral. Specifically, Signature agreed to pay the following:

> (i) all fees and expenses of the Debtors owed to the Court, the United States Trustee, and the Debtors' and Committee's professionals pursuant to the Carve-Out, including: (a) the unpaid fees of the clerk of the Bankruptcy Court or District Court, as applicable; (b) the unpaid fees of the U.S. Trustee pursuant to 28 U.S.C. §§ 1930(a) and (b); (c) the fees and expenses of Debtors' counsel in an amount not to exceed $415,000.00; (d) the fees and expenses of Cantor in an amount not to exceed $175,000.00; and (e) the fees and expenses of the Committee's Professionals in an amount not to exceed $100,000.00 plus any unused budget line items;

> (ii) one-half, or $60,000.00, of the R.R. Donnelly & Sons cure amount (totaling $120,000.00);

      (iii)     to share with the unsecured creditors, *pro rata*, the Net Avoidance Action Proceeds recovered in excess of $75,000.00; and

      (iv)     fees related to the Debtors' Wind Down up to $100,000.00;

## G.     Post-Closing Activities of the Debtors

After the closing of the sale, the Debtors worked with the Creditors' Committee to formulate a joint plan of liquidation and disclosure statement. The Debtors also continued to negotiate various outstanding objections related to the Cure Notice.

## ARTICLE IV.
## THE LIQUIDATING PLAN

### A.     Introduction

The following summary and other descriptions in this Disclosure Statement are qualified in their entirety by reference to the provisions of the Plan and its exhibits, a copy of which is annexed hereto as Exhibit A. Each holder of a Claim or Equity Interest is urged to carefully review the terms of the Plan. In the event of any inconsistency between the provisions of the Plan and the summary contained herein, the terms of the Plan shall govern. Moreover, all capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings set forth in the Plan.

In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the Plan, and (iii) contains other provisions necessary to the reorganization or liquidation of the debtor. Under the Bankruptcy Code, "claims" and "equity interests" are classified rather than "creditors" and "shareholders" because such entities may hold claims or equity interests in more than one class. For purposes of this Disclosure Statement, the term "holder" refers to the holder of a Claim or Interest, respectively, in a particular Class under the Plan.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors are altered, modified or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired," and the holders of such Claim or Interest are entitled to vote in favor or against the Plan.

A Chapter 11 plan may specify that certain classes of claims or equity interests are either to be paid in full upon effectiveness of the Plan or are to remain unchanged by the Plan. Such classes are referred to as "unimpaired," and because of such favorable treatment the holders in such classes are deemed to accept the Plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution or property or retain any claim against a debtor. Such classes are deemed to have rejected the Plan and, therefore, need not be solicited to vote to accept or reject the Plan.

**B.**     **Overview of Plan Treatments of Claims**

The Plan provides for the establishment of a Creditor Trust, to be administered by a Creditor Trustee for the benefit of holders of Allowed General Unsecured Claims. The Creditor Trust will be funded by the Trust Assets, which are comprised of all Assets of the Debtors' Bankruptcy Estates together with all profits and proceeds therefrom including without limitation: (i) the Committee Settlement Amount; (ii) the Rights of Action; and (iii) the Excluded Assets.

The amount of the Trust Assets available for distribution shall be determined in the sole discretion of the Creditor Trustee after taking into account any appropriate reserves and expenses. The Creditor Trustee will also administer the Wind Down Fund, any unused portion of which shall be transferred to the Creditor Trust to be distributed Pro Rata to all holders of Allowed General Unsecured Claims.

## C. Administrative Claims and Professional Fees

As provided in Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims are unclassified claims, not considered Impaired and not entitled to vote on the Plan, because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. These non-voting Claims shall be treated separately as unclassified Claims as set forth in the Plan.

### 1. Administrative Claims in General

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Creditor Trustee shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on the Initial Distribution Date.

### 2. Bar Date for Administrative Expense Claims

Proofs of Administrative Expense Claims and/or requests for the allowance and payment of Administrative Expense Claims, other than Professional Fees, unless otherwise required pursuant to a prior order of the Bankruptcy Court, must be filed and served by the date set by this Court pursuant to the order confirming the Disclosure Statement. Any Person that fails to file proof of an Administrative Expense Claim or a request for payment thereof on or before the Administrative Claims Bar Date shall be forever barred from asserting such Claim against the Debtors or the Bankruptcy Estates, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, or recover such Administrative Expense Claim.

### 3. Statutory Fees

All unpaid fees due and payable under 28 U.S.C. § 1930 shall be paid by the Creditor Trustee from the Wind Down Fund, as such fees arise prior to and after the Effective Date, until a Final Decree is entered in these Chapter 11 Cases.

### 4. Professional Fees

(a) Time for Filing and Allowance

All Professionals requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code §§ 327, 328, 330, 331, 503(b), and 1103 for services rendered prior to the Effective Date must (i) file and deliver to counsel to the Committee, by no later than five (5) Business Days prior to the Confirmation Hearing, a written estimate of all unpaid amounts for which compensation will be sought; and (ii) file and serve pursuant to the Bankruptcy Code, the Interim Compensation Order and applicable rules, an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date or be forever barred from asserting such claims against the Bankruptcy Estate or the Debtors and their respective successors and/or assigns, the Creditor Trust, or the Creditor Trustee. Professional Fees with respect to which a fee application is properly filed shall be Allowed Professional Fees only to the extent allowed by Final Order of the Bankruptcy Court. Only Allowed Professional Fees shall be paid pursuant to the Plan. Any objection to Professional Fees shall be filed on or before the date specified in the application for final compensation.

(b) Payment of Professional Fees

Within twenty (20) days after receipt of a Final Order of the Bankruptcy Court allowing any Professional Fees, the Creditor Trustee shall pay the full Allowed amount of Professional Fees for services rendered on or before the Closing Date, first from the Wind Down Fund.

(c) Professional Fees Not Payable from the Committee Settlement Amount

No Professional Fees shall be paid from the Committee Settlement Amount.

(d) Retainers Held by Professionals

On the Effective Date, all Professionals holding an unapplied retainer or portion thereof, in excess of fees and expenses allowed by the Bankruptcy Court, shall remit all such funds to the Creditor Trustee, which funds shall be added to the Creditor Trust.

(e)     Fees and Expenses of Creditor Trustee

The Creditor Trustee shall administer the Wind Down Fund.  On the Effective Date, the Debtors and any other person in possession, custody or control of any Assets including, without limitation, the Wind Down Fund, shall turn such Assets over to the Creditor Trustee.   The Creditor Trustee shall be entitled to payment of reasonable fees and expenses for all services rendered, or to be rendered, in its capacity as Creditor Trustee, as well as all expenses incurred, or to be incurred, in connection with the administration and wind down of these Chapter 11 Cases, the Creditor Trust, and the Plan.

**5.     Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, at the sole option of the Creditor Trustee, each holder of an Allowed Priority Tax Claim shall receive in full and complete settlement, satisfaction, and discharge of its Allowed Priority Tax Claim: (a) Cash in an amount equal to such Allowed Priority Tax Claim on the Initial Distribution Date, or (b) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate, which is consistent with applicable laws or as set by order of the Bankruptcy Court, over a period not exceeding five (5) years after the Filing Date, which shall begin on the Initial Distribution Date.

**6.     Priority Claims**

Except to the extent that a holder of an Allowed Priority Claim agrees to a different treatment, each such holder of an Allowed Priority Claim shall receive from the Creditor Trust, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on the Initial

Distribution Date.

**D.      Classification and Treatment of Claims and Equity Interests**

The Plan divides the Claims against, and Equity Interests in, the Debtors into four (4) Classes and provides for treatment of each Class as follows:

Class 1 – Signature Allowed Claim – Impaired

Class 1 consists of the Signature Allowed Claim.  Signature holds an allowed general unsecured claim in the amount of $60,000.00.  Signature previously agreed to receive the following treatment in full and final satisfaction of the Signature Allowed Claim: (i) the first $45,000.00 of the Net Avoidance Action Proceeds; and (ii) a Pro Rata share of all Trust Assets except the Committee Settlement Amount.  Class 1 is impaired and entitled to vote on the Plan.

Class 2 – Allied Allowed Claim – Impaired

Class 2 consists of the Allied Allowed Claim.  Allied holds an allowed general unsecured claim in the amount of $16,559,260.16.  Allied previously agreed to receive the following in full and final satisfaction of the Allied Allowed Claim: (i) $30,000.00 in Net Avoidance Action Proceeds solely to the extent that Signature first receives $45,000.00 of the Net Avoidance Action Proceeds; and (ii) a Pro Rata share of all Trust Assets, except the Committee Settlement Amount.  Class 2 is impaired and entitled to vote on the Plan.

Class 3 – Allowed General Unsecured Claims – Impaired

Class 3 consists of all Allowed General Unsecured Claims.  The Committee estimates that the total of all filed and scheduled Class 3 Claims (excluding the claims for Signature and Allied) equals $1,643,943.92.  The Committee estimates that Class 3 Claimants will receive a distribution of approximately 15%.  The actual distribution may vary as a result of several factors, not all of which can be identified or predicted at this time.  For example, if the Net Avoidance Action Recoveries are greater than expected, the distribution to Class 3 Claimants

may increase. On the other hand, if the costs (including professional fees and expenses) related to approval of the Plan and Disclosure Statement, claims objections, or distributions is greater than expected, the distribution to Class 3 Claimants may decrease.

Class 3 Claimants will receive: (i) after making payments to Signature and Allied as described above, a Pro Rata distribution of all remaining Net Avoidance Action Proceeds; (ii) a Pro Rata share, with Signature and Allied, of all Trust Assets except the Committee Settlement Amount; and (iii) a Pro Rata distribution of the Committee Settlement Amount. Class 3 Claimants are Impaired and are entitled to vote on the Plan.

Class 4 – Equity Holders – Impaired

Holders of Class 4 Claims will not receive any distribution and are presumptively deemed to have rejected the Plan.

E.    **Effect Of Confirmation of the Plan**

1.    **Vesting of Assets**

On the Effective Date, all Assets of any kind and nature whatsoever, of the Bankruptcy Estates shall vest in and be conveyed and transferred to the Creditor Trust free and clear of all Liens, Claims, Equity Interests, and encumbrances of the Debtors or any Creditor or any other Persons, except the obligations, rights and liens continued or granted pursuant to the Plan and the Confirmation Order. The Trust Assets shall be managed by the Creditor Trustee and used for the sole purposes of consummating and carrying out the Plan and effectuating distributions to holders of Allowed Claims as provided hereunder. Nothing herein shall prevent the Creditor Trustee from abandoning any Assets after the Confirmation Date.

2.    **Authority to Effectuate Plan**

Upon the entry of the Confirmation Order by the Bankruptcy Court and except as provided herein, any treatment or actions provided for or contemplated under the Plan shall be

deemed to be authorized and approved without any further order or approval of the Bankruptcy Court. The Debtors and the Creditor Trustee shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary or proper to consummate and carry out the Plan, to consummate any transaction provided for herein and to effectuate the distributions provided for hereunder. The Creditor Trustee is also expressly authorized and empowered to liquidate, sell, dispose of, or abandon any and all Trust Assets, to distribute the proceeds thereof in accordance with the Plan and the Creditor Trust Agreement and to pay all costs and expenses associated with such sale, liquidation or disposition without further order of the Bankruptcy Court.

### 3.  Binding Effect

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan, the Confirmation Order and all exhibits thereto shall bind all Claimants and holders of Equity Interests, whether or not such persons voted, or had a right to vote, to accept or reject the Plan.

### 4.  Corporate Action and Dissolution of Debtor

Each of the matters provided for under the Plan involving any corporate action to be taken or required by the Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by stockholders, officers, directors, managers, or members of the Debtors. The Creditor Trustee may take such action as necessary to dissolve the Debtors. Upon the Effective Date, the existing Boards of Directors of the Debtors and any remaining officers of the Debtors shall be dismissed.

### 5. Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee will dissolve and its members will be released and discharged from all further duties and obligations arising from or related to the Chapter 11 Cases. The professionals retained by the Creditors' Committee and the members thereof will not be entitled to compensation or reimbursement of expenses for any services rendered after the Effective Date other than in connection with the preparation and approval of applications under Bankruptcy Code §§ 330 and 503 and matters related thereto, provided, however, that the Creditor Trustee shall be entitled to compensation as provided herein. Additionally, persons who served as professionals to the Creditors' Committee prior to the Effective Date may also continue to serve as professionals to the Creditor Trustee and shall be entitled to compensation.

### 6. Late Claims

Any Claim filed after the Bar Date shall be unenforceable unless the Claimant has been granted an extension of time to file a Claim by the Bankruptcy Court and such entity shall not be treated as a creditor or Claimant for the purposes of voting or distributions with respect to the Plan. Unless otherwise expressly ordered by the Bankruptcy Court, any such late-filed Claim shall not be entered on the official claims register, shall be deemed Disallowed and expunged and the Claimant shall receive no distribution under the Plan or from the Trust Assets.

### 7. Substantive Consolidation

The Plan provides for the substantive consolidation and merger of the Debtors' Bankruptcy Estates. As of the Confirmation Date, only one consolidated and merged Estate shall exist and all assets of and claims against any of the Estates shall be considered to be owned by or held against the merged Estate.

8.      **Funding of Plan**

The sources of all Cash necessary to fund payments and distributions under the Plan shall be the Wind Down Fund, the Committee Settlement Amount, the Rights of Action, and all other Assets.

9.      **Cancellation of Instruments and Equity Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims and all Equity Interests in the Debtors shall be cancelled and deemed terminated, without any further act or action under any applicable agreement, law, regulations, order, or rule.

F.      **Provisions Governing the Creditor Trust and Rights of Action**

1.      **Creation of the Creditor Trust**

On the Effective Date, the Creditor Trust shall be created as the vehicle for implementation of the Plan. The Creditor Trust Agreement shall be executed and delivered in a form acceptable to the Creditors' Committee. All right, title, and interest of the Bankruptcy Estates' in the Assets shall be transferred, assigned, and delivered to the Creditor Trust, free of all Claims, Liens, and Interests, to be managed as Trust Assets by the Creditor Trustee in accordance with the terms of the Creditor Trust Agreement for the sole purposes of consummating and carrying out the Plan. All other necessary steps shall be taken to establish the Creditor Trust and the beneficial interests therein.

The Creditor Trustee shall reduce to Cash or otherwise liquidate the unliquidated Trust Assets, and after deducting costs and expenses of liquidating, disposing, or maintaining such Assets, other costs and expenses of the Creditor Trust, and setting aside such reserves as required by the Creditor Trustee in its sole discretion, the Creditor Trustee shall distribute the Trust Assets in accordance with the terms of the Plan and Creditor Trust Agreement.

The Creditor Trustee shall have the powers, duties, and obligations set forth in the Plan and the Creditor Trust Agreement.  The costs and expenses incurred by the Creditor Trustee on and after the Effective Date shall be paid from the Trust Assets.  Upon entry of the Final Decree and as otherwise provided in the Creditor Trust Agreement, the Creditor Trust shall be terminated and dissolved without further action by the Creditor Trustee.  In connection with the above-described assets, any and all rights, claims, and causes of action, any attorney-client or similar privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Creditor Trust shall vest with the Creditor Trustee and its representatives.

The Creditor Trust will terminate no later than the third (3rd) anniversary of the Effective Date, provided, however, that upon motion of the Creditor Trustee or a party in interest, the Bankruptcy Court may extend the term of the Creditor Trust for a fixed period if it is necessary or appropriate to facilitate or complete the liquidation and distribution of the Trust Assets.  Additional extensions can be obtained so long as Bankruptcy Court approval is obtained; provided, however, that the aggregate of all such extensions shall not exceed five (5) years, unless the Creditor Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Creditor Trust as a grantor trust for federal income tax purposes.

The Creditor Trust shall be established for the sole purpose of liquidating and distributing the Trust Assets, in accordance with Treasury Regulation Section 301.7701–4(d), with no objective to continue or engage in the conduct of a trade or business.

For federal income tax purposes, all parties including, without limitation, the Debtors, the Creditor Trustee, and the beneficiaries of the Creditor Trust, shall treat the transfer of assets to

the Creditor Trust, in accordance with the terms of the Plan and the Creditor Trust Agreement, as a transfer to the holders of Allowed General Unsecured Claims in full satisfaction of such Claims, followed by a transfer by such Claimants to the Creditor Trust, and the beneficiaries of the Creditor Trust shall be treated as the grantors and owners thereof.

The beneficial interests in the Creditor Trust shall not be certificated and are not transferable.

2.      **Responsibilities of the Creditor Trustee**

(a)      As of the Effective Date, the Creditor Trustee, on behalf of the holders of Allowed General Unsecured Claims, the Debtors, or the Bankruptcy Estates, as applicable, shall be responsible for: (i) liquidating or otherwise reducing to Cash the unliquidated Trust Assets; (ii) filing, prosecuting, compromising, and settling the Rights of Action; (iii) making distributions under the Plan; (iv) settling, resolving, and objecting to Claims including Unsecured Claims; (v) seeking estimation of contingent or unliquidated Claims including Unsecured Claims under Bankruptcy Code § 502(c); (vi) investing the Trust Assets; (vii) establishing claims reserves as the Creditor Trustee, in its sole discretion, deems appropriate; (viii) paying and satisfying Administrative Claims, Priority Claims, and Wind Down Expenses; (ix) winding up the affairs of the Debtors and the Bankruptcy Estates; (x) complying with, enforcing, and carrying out the terms of the Plan and Creditor Trust Agreement; and (xi) making and filing all tax returns for the Creditor Trust.

(b)      The Creditor Trustee shall invest the Trust Assets in: (a) direct obligations of the United States of America or obligations of any agency or instrumentality thereof, which are guaranteed by the full faith and credit of the United States of America; (b) money market deposit accounts, checking accounts, savings accounts, or certificates of deposit, or other time

deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; (c) any other investments that may be permissible under either Bankruptcy Code § 345 or any order of the Bankruptcy Court entered in the Debtors' Chapter 11 Cases; or (d) any other investments as provided under the Creditor Trust Agreement.

(c)     The Creditor Trustee shall have sole authority, without further Bankruptcy Court approval, to liquidate or otherwise dispose of the Trust Assets, to file, prosecute, and settle objections to Claims, to pursue, settle, or otherwise resolve or abandon any Rights of Action, to hire and pay professional fees and expenses of counsel and other advisors, and to take such other actions as shall be necessary to implement the Plan, wind down the Debtors' affairs, and effect the closing of these Chapter 11 Cases or as otherwise provided under the Creditor Trust Agreement.

**3.      The Creditor Trustee Shall be U.S. Bank, N.A.**

(a)     The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitration, or other action or proceeding shall be commenced against the Creditor Trustee in its official or personal capacity, with respect to its status, duties, powers, acts, or omissions as the Creditor Trustee in any forum other than the Bankruptcy Court.

(b)     The Creditor Trustee shall act on behalf of the Creditor Trust to carry out its obligations and to exercise its rights in accordance with and subject to the Plan, the Confirmation Order and the Creditor Trust Agreement.  The Creditor Trustee shall be vested with the rights, powers, and benefits as set forth in the Creditor Trust Agreement, including without limitation, all rights, powers, and benefits afforded a "trustee" under Bankruptcy Code §§ 704 and 1106.

(c)     The Creditor Trustee shall be compensated as set forth in Exhibit A to the Creditor Trust Agreement and shall not be required to file a fee application or obtain any approval of the Bankruptcy Court to receive compensation.  Subject to the provisions of the Creditor Trust Agreement, the Creditor Trustee shall be entitled to hire and engage such professionals as it deems appropriate to assist in carrying out the duties of the Creditor Trust, with the reasonable fees and expenses of such professionals to be paid from the Trust Assets. The Creditor Trustee may pay from the Trust Assets all reasonable fees and expenses incurred in connection with the duties and actions of the Creditor Trustee, including, but not limited to, fees and expenses of the Creditor Trustee's professionals, insurance, taxes, and other expenses arising in the ordinary course of business in maintaining, liquidating, disposing of, and the distribution of the Trust Assets and compensation to the Creditor Trustee.  The Creditor Trustee may pay all such reasonable fees and expenses without Bankruptcy Court approval.  Any disputes concerning the administration of the Creditor Trust or implementation of the distribution of the Trust Assets may be brought before the Bankruptcy Court for resolution.

(d)     The Creditor Trustee shall be authorized and empowered to object to Claims and to pursue and prosecute, settle, or decline to pursue such objections, as well as the Rights of Action, whether or not the Rights of Action or objections to Claims have been commenced prior to the Effective Date.  The Creditor Trustee shall be substituted as the real party in interest in any such action or objection, commenced by or against the Debtors or the Creditors' Committee and may pursue, or decline to pursue, such objections or Rights of Action. The Creditor Trustee may, in its sole discretion and business judgment, settle, release, sell, assign, otherwise transfer, or compromise such objections and Rights of Action, subject to the provisions of the Plan, without Bankruptcy Court approval

(e)     Upon entry of the Confirmation Order, the Creditor Trustee shall be deemed substituted as Plaintiff in all Avoidance Actions, including without limitation, all Actions commenced by Signature Bank, pursuant to the Authority granted to Signature Bank in the Order of the Bankruptcy Court entered on March 19, 2010,  Counsel to Signature Banks shall continue as Counsel to the Creditor Trustee and all existing arrangements and agreements for compensation and reimbursement of expenses of such Counsel shall be applicable to and bind the Creditor Trustee.

(f)     The Creditor Trustee may, but shall not be required to, set-off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim and/or Right of Action the Estate may have against the Claimant; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Creditor Trustee of any such Right of Action, set-off or recoupment which the Debtors may have against such Claimant.

(g)     A substituted Creditor Trustee may be designated after resignation or other removal of the Creditor Trustee as provided under the Creditor Trust Agreement.

## 4.     Maintenance of Rights of Action

In accordance with Bankruptcy Code § 1123(b)(3), the Debtors and Signature Bank transfer and assign all Rights of Action of the Debtors to the Creditor Trust.  Except as otherwise provided in the Plan, from and after the Effective Date, the Creditor Trustee shall have the exclusive right, authority and discretion to pursue, enforce, institute, prosecute, abandon, settle, or compromise any and all Rights of Action.  The Creditor Trustee may settle such Rights of Action without Bankruptcy Court approval (i) if the amount in controversy is less than $150,000; or in all other cases (ii) if the amount in controversy exceeds the amount for which such controversy is to be settled by less than $150,000.

**5.      Preservation of All Rights of Action Not Expressly Settled or Released**

Unless a Right of Action against a Creditor or other entity is expressly and specifically waived, relinquished, released, compromised, or settled in the Asset Purchase Agreement or the Sale Order or pursuant to the Plan, or any Final Order, and notwithstanding confirmation of the Plan and the *res judicata* effect thereof, nothing in the Plan, the Disclosure Statement, the Confirmation Order or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any Right of Action, or other legal or equitable defense that the Debtors had immediately prior to the commencement of these Chapter 11 Cases, against or with respect to any Claim or Equity Interest, and the Debtors and Creditor Trustee expressly preserve such Right of Action for later enforcement by the Creditor Trustee.

Any entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods, or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Creditor Trustee subsequent to the Effective Date and may, if appropriate, be the subject of an action, application, motion, objection, or contested matter after the Effective Date, whether or not (i) such entity has filed a proof of claim against the Debtors in these Chapter 11 Cases, (ii) such entity's proof of claim has been the subject of an objection, (iii) such entity's Claim was included in the Debtors' Schedules, or (iv) such entity's scheduled claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

For the avoidance of doubt, all Avoidance Actions commenced by Signature Bank shall be preserved and not released.

### G. The Distribution to Creditors

#### 1. Distributions

The Creditor Trustee shall make distributions to holders of Allowed Claims to the extent required by and in accordance with the terms of the Plan net of required reserves and expenses.

#### 2. Claims Allowed as of the Initial Distribution Date

The Creditor Trustee shall make a distribution on the Initial Distribution Date (or as soon thereafter as is practicable) to all beneficiaries of the Creditor Trust by virtue of such persons holding Allowed Claims as provided under the Creditor Trust Agreement. Distributions on account of Claims that become allowed after the Initial Distribution Date shall be made by the Creditor Trustee pursuant to the provisions of the Plan and Creditor Trust Agreement from the reserve set aside by the Creditor Trustee for Disputed Claims.

#### 3. Trust Reserves

The Creditor Trustee shall maintain such reserves, for Disputed Claims and otherwise, as it deems necessary to administer the Creditor Trust under the terms of the Plan. In the event that a portion or all of any reserve established by the Creditor Trustee becomes unnecessary, the funds from such reserve shall be transferred to the Creditor Trust for distribution to beneficiaries of the Creditor Trust.

#### 4. Time and Manner of Payments

Any payment in Cash shall be made by check in United States Dollars drawn on a domestic bank.

#### 5. Delivery of Distributions

Subject to the provisions of Bankruptcy Rules 2002(g) and 9010 and except as otherwise agreed with a holder of an Allowed Claim as provided in the Plan, distributions to holders of Allowed Claims shall be made at the address of each such Claimant as set forth on the Schedules

filed with the Bankruptcy Court unless superseded by the address set forth on proofs of claim filed by such Claimants, or if the Creditor Trustee has been notified in writing of a change of address.

6.    **Undeliverable Distributions**

(a)    <u>Holding of Undeliverable Distributions</u>:    If any distribution to any Claimant is returned to the Creditor Trustee as undeliverable, no further distributions shall be made to such Claimant unless and until the Creditor Trustee is notified, in writing, of such Claimant's then-current address, at which time all missed distributions, to the extent provided under this Article shall be made to such Claimant without interest.    Subject to Section 8.6(b) of the Plan, undeliverable distributions shall remain in the possession of the Creditor Trustee until such time as a distribution becomes deliverable.    Nothing contained in the Plan shall require the Creditor Trustee to attempt to locate any holder of an Allowed Claim.

(b)    <u>Failure to Claim Undeliverable Distributions</u>:    Within ten (10) Business Days after the later of, six (6) months following the Initial Distribution Date, or each distribution under the Plan, the Creditor Trustee shall file a list with the Bankruptcy Court setting forth the names and addresses used by the Creditor Trustee of those Claimants for which distributions have been attempted hereunder and have been returned as undeliverable as of the date thereof, or for which payments have been made by check but which checks have not been negotiated.    Any such Claimant that does not assert its rights pursuant to the Plan to receive a distribution within two (2) months after the filing of such list shall have its Claim for such undeliverable distribution and all future distributions discharged and shall be forever barred from asserting any such Claim against the Bankruptcy Estates, the Debtors, and their respective successors and/or assigns, the Creditor Trustee, the Creditor Trust, or the Trust Assets.    In such case, all unclaimed

distributions shall revert to the Creditor Trust and be applied in accordance with the terms of the Plan. All uncashed checks will be subject to and governed by Section 8.8 of the Plan.

### 7. Time Bar to Payments

Checks issued by the Creditor Trustee on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days from and after the date of issuance. Requests for reissuance of any check shall be made directly to the Creditor Trustee by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made on or before the later of: (a) six (6) months following the Distribution Date, or (b) sixty (60) days after the date of issuance of such check. After such date, all claims in respect of voided checks shall be discharged and forever barred and the right to all moneys from the voided checks and any future distributions to such claimants shall revert to the Creditor Trust and be applied in accordance with the terms of the Plan.

### 8. Fractional Dollars, *De Minimis* Distributions

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. The Creditor Trustee shall not be required to make payments of less than fifty dollars ($50) on account of any Allowed Claim, unless a specific request is made in writing to the Creditor Trustee. Absent written request, the Creditor Trustee may retain any such sums and, until the total distribution due to such creditors exceeds $50 or until the final distribution is made under the Plan, at which point the Creditor Trustee shall distribute all sums due such Claimants. In addition, after the Initial Distribution Date, the Creditor Trustee shall not be required to make any distribution on account of any Claim in the event that the costs of making such distribution payment exceed the amount

of such distribution payment, and all cash that otherwise would have been distributed to Claimants holding such *de minimis* claims shall otherwise be distributed in accordance with the terms of the Plan and Creditor Trust Agreement.

9.      **Compliance with Tax Requirements**

To the extent applicable, the Creditor Trustee in making distributions under the Plan shall comply with all tax withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all distributions hereunder shall be subject to such reporting and withholding requirements.  The Debtors and Newco shall provide the Creditor trustee with all tax information, and shall assist in any tax and reporting issues as requested by Creditor Trustee, including, without limitation, by providing copies of all tax forms in the Debtors' or Newco's possession related to Claimants.  The Creditor Trustee may withhold the entire distribution due to any holder of an Allowed Claim until such time as such Claimant provides the Creditor Trustee with the necessary information to comply with any withholding requirements.   If the Claimant fails to provide the Creditor Trustee with the necessary information to comply with withholding requirements within six (6) months after the date of the first request by the Creditor Trustee for such information or for the Cash necessary to comply with any applicable withholding requirements, then the Claimant's distribution shall be treated as an undeliverable distribution in accordance with the Plan.  For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

10.      **Set-Offs and Recoupments**

The Creditor Trustee, as successor to the Debtors, pursuant to Bankruptcy Code § 553 or applicable non-bankruptcy law, may set off and/or recoup against any Allowed Claim against the distributions to be made pursuant to the Plan (before any distribution is made on account of such

Claim), the claims, rights, and causes of action of any nature that the Bankruptcy Estates may hold against the holder of such Allowed Claim. Neither the failure to effect such a set-off nor the allowance of any Claim hereunder shall constitute a waiver or release by the Creditor Trustee or the Bankruptcy Estates of any such claims, rights, and causes of action that such parties may possess under Bankruptcy Code § 553.

       **11.     Payments and Actions Required Not on Business Days**

      If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or performance of such act may be completed on the next succeeding Business Day and shall be deemed to have been completed as of the required date.

**H.     Procedures for Resolving Objections to Claims**

       **1.     Prosecution of Objections to Claims**

      Unless another time is set by order of the Bankruptcy Court, all objections to Claims shall be filed with the Bankruptcy Court and served upon the Claimant whose Claim is objected to by the later of (a) one hundred-eighty (180) days after the Effective Date; or (b) one hundred-eighty (180) days after a timely Proof of Claim or request for payment with respect to such Claim is filed; provided, however, that the Creditor Trustee may seek an extension of such time to object. Objections to Professional Fees shall be filed in the manner required by the Court.

       **2.     Estimation of Claims**

      The Creditor Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated General Unsecured Claim pursuant to Bankruptcy Code § 502(c) regardless of whether the Debtors or the Creditor Trustee previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to

any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Creditor Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

### 3. Cumulative Remedies

All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved as provided herein or by any mechanism approved by the Bankruptcy Court. Until such time as a Claim becomes Allowed, such Claim shall be treated as Disputed for purposes related to allocations and distributions.

### 4. Allowance of Claims and Interests

(a) <u>Disallowance of Claims</u>: Pursuant to Bankruptcy Code §§ 105 and 502(d), no distributions will be made with respect to Claims that are Disputed or to Claimants from which property is recoverable under Bankruptcy Code §§ 542, 543, 550, 553, 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) (including the Avoidance Actions) until such time as such objection or causes of action against that Claimant have been settled or resolved by a Final Order and all sums due to the Debtors are turned over to the Creditor Trust. As soon as practicable after the date on which a Claim that is Disputed becomes Allowed, the holder of such newly Allowed Claim will receive all distributions to which it is entitled under the Plan.

(b) <u>No Distribution Pending Allowance</u>: Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim. Any person who holds both an

Allowed Claim and a Claim that is Disputed will receive the appropriate distribution on the Allowed Claim, but will not receive a distribution on the Claim that is Disputed.

(c)     Allowance of Claims:  Except as expressly provided for in the Plan, no Claim shall be deemed Allowed by virtue of the Plan, Confirmation Order, or any order of the Bankruptcy Court in these Chapter 11 Cases, unless and until such Claim is Allowed.

## I.    Executory Contracts and Unexpired Leases

### 1.    Rejection of Executory Contracts and Unexpired Leases

Any executory contracts or unexpired leases (i) which have not expired by their own terms on or prior to the Confirmation Date, or (ii) which have not been assumed and assigned or rejected with the approval of the Bankruptcy Court or pursuant to procedures established by order of the Bankruptcy Court, shall be deemed rejected by the Debtors on the Confirmation Date unless expressly preserved by Order of the Court.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to Bankruptcy Code §§ 365(a) and 1123 as of the Confirmation Date.

## J.    Conditions Precedent

### 1.    Conditions Precedent to Confirmation of Plan

Confirmation of the Plan will not occur unless each of the following conditions precedent have occurred or have been waived in writing by the Creditors' Committee:

(a)     The Bankruptcy Court shall have approved a Disclosure Statement in form and substance acceptable to the Creditors Committee.

(b)     There is sufficient Cash to pay Allowed Administrative Claims, Non-Tax Priority Claims, and Priority Tax Claims in full (or in such lesser amount as may be agreed to by the Claimant and the Creditors Committee).

(c)     The Confirmation Order shall be approved in form and substance acceptable to the Creditors' Committee.

## 2.     Conditions to Effectiveness of Plan

The Effective Date shall not occur unless each of the following conditions precedent has occurred or been waived in writing by the Creditors' Committee:

(a)     The Confirmation Order has become a Final Order. The Debtors and all other parties in interest having possession, custody or control over Assets transfers substantially all Trust Assets and the Wind Down Fund to the Creditor Trust.

(b)     The Creditor Trust has been created pursuant to the terms of the Plan, the Creditor Trustee has been appointed and approved by the Bankruptcy Court and the Creditor Trust Agreement has been executed by the Creditor Trustee.

(c)     All other actions and documents necessary to implement the Plan shall have been effected and executed.

## 3.     Retention of Jurisdiction

The Bankruptcy Court shall retain and have subject matter jurisdiction over any matter arising under the Bankruptcy Code, or arising in or related to these Chapter 11 Cases and the Plan and for the following purposes:

(a)     to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors were or are a party or with respect to which the Debtors may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)     to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, transactions, and other agreements or documents created in connection with the Plan;

(c)     to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, are available to the Bankruptcy Estates and that may be instituted by the Creditor Trustee after the Effective Date (to the extent such venue is selected by the Creditor Trustee,

including, but not limited to any claims or causes of action arising under Bankruptcy Code §§ 542, 543, 544, 545, 547, 548, 549, or 553(b));

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(e)    to hear and determine any timely objections to Claims, both before and after the Effective Date, including any objections to the classification of any Claim, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of, or secured or unsecured status of any Claim, in whole or in part;

(f)    to enforce the Creditor Trustee's interest in the Cash, the Wind Down Fund, the Assets, and the Trust Assets, and the Creditor Trustee's right to pursue objections to Claims, Rights of Action, and all other rights of the Creditor Trustee to the Trust Assets;

(g)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(h)    to issue orders in aid of execution of the provisions of the Plan to the extent authorized by Bankruptcy Code § 1142, including, but not limited to, orders interpreting, enforcing, or clarifying the provisions thereof;

(i)    to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order to the extent authorized by the Bankruptcy Code;

(j)    to hear and determine all applications for allowance of compensation for services rendered and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan incurred prior to the Effective Date;

(k)    to hear and determine any and all objections to and proceedings involving the allowance, estimation, classification, and subordination of Claims;

(l)    to hear and determine all suits, controversies and disputes arising in connection with or relating to the Plan, or any orders of the Bankruptcy Court in the Chapter 11 Cases entered on or before the Effective Date, the interpretation, implementation, enforcement or consummation of the Plan, or any orders of the Bankruptcy Court in the Chapter 11 Cases entered on or before the Confirmation Date, or the extent of any entity's obligations incurred in connection with or released under the Plan;

(m)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the consummation or enforcement of the Plan;

(n)    to enforce all orders, judgments, and rulings entered in connection with the Chapter 11 Cases and to determine any other matters that may arise in connection with or are related

to the Plan, the Disclosure Statement, the Asset Purchase Agreement, the Confirmation Order, or the Creditor Trust Agreement;

(o)     to enter any order, including injunctions necessary to enforce the title, rights, and powers of the Debtors or the Creditor Trustee and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary or appropriate, the Creditor Trust Agreement or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(p)     to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code §§ 346, 505, and 1146;

(q)     to hear any other matter for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code, including the allowance or disallowance and classification of late-filed proofs of claim in accordance with Bankruptcy Rule 9006(b);

(r)     to enter a Final Decree closing these Chapter 11 Cases;

(s)     to resolve any matters that may arise in connection with the Creditor Trust or the Creditor Trust Agreement;

(t)     to determine and hear any actions or controversies by or against the Creditor Trustee;

(u)     to hear and determine any matter relating to or arising out of any action or act taken or omission in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation, or consummation of the Plan, the Disclosure Statement or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, or any other act or omission taken or to be taken in connection with the Chapter 11 Cases commenced against any party in the Chapter 11 Cases, including, without limitation, the Creditor Trustee, the Debtors, the Creditors' Committee, and their respective current and former directors and officers, members, agents, advisors, attorneys, advisors, and other professionals and Entities employed pursuant to Bankruptcy Code §§ 327 and 1103;

(v)     to adjudicate all causes of action to recover all assets and properties of the Debtors and Bankruptcy Estates wherever located;

(w)     to hear and determine any and all objections to payments under the Plan;

(x)     to adjudicate all claims or controversies arising out of any purchases, sales, or contracts made or undertaken by the Debtors during the pendency of the Chapter 11 Cases; and

(y)     to enforce the permanent injunction created by the Confirmation Order and Section 13.3 hereof.

### K.  Modification of Plan

The Creditors' Committee reserves its rights, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order subject to compliance with Bankruptcy Code § 1125 and provided that the Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123.  Upon entry of the Confirmation Order, the Creditors' Committee may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with Bankruptcy Code § 1127(b), or remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  Claimants that have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of their Claims under the Plan.

### L.  Revocation or Withdrawal

The Plan may be revoked or withdrawn by the Creditors' Committee prior to the Confirmation Date.  If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by the Debtors or their Bankruptcy Estates, or any other entity, or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

### M.  Injunction

**All Entities who have held, hold, or may hold Claims or Interests are permanently enjoined, from and after the Effective Date, from: (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest; (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any encumbrance of any**

**kind; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against each of the Creditor Trust, the Trust Assets, the Creditor Trustee, and all professionals retained by the Creditor Trust.**

**N.      Discharge**

As provided in Bankruptcy Code § 1141(d)(3), the Plan does **not** grant the Debtors a discharge.  Notwithstanding the foregoing, except as otherwise provided herein:  (1) the rights afforded in the Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, discharge, and release of such Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Filing Date, against the Debtors, the Creditor Trust, the Creditor Trustee, or any of their Assets or properties; and (2) all Persons and Entities shall be precluded from asserting against the Debtors, the Creditor Trust, the Creditor Trustee, or any of their Assets any other or further Claims or Equity Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred before the Confirmation Date, except as otherwise provided in the Plan.

**O.      Term of Existing Injunctions or Stays**

Unless otherwise provided, all injunctions or stays provided for in these Chapter 11 Cases pursuant to Bankruptcy Code §§ 105, 362 or 524, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, and thereafter shall be annulled.

**P.      Exculpation and Limitation of Liability**

**(A)      NONE OF THE DEBTORS, THE CREDITOR TRUST, THE CREDITOR TRUSTEE, OR THE CREDITORS' COMMITTEE, AND ANY OF THEIR RESPECTIVE PRESENT OF FORMER MEMBERS, OFFICERS, DIRECTORS, EMPLOYEES, ADVISORS, AGENTS OR ATTORNEYS, OR OTHER**

**PROFESSIONALS SHALL HAVE OR INCUR ANY LIABILITY TO ANY CLAIMANT OR HOLDER OF AN EQUITY INTEREST, OR ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS, PROFESSIONALS OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THESE CHAPTER 11** Cases, including, without limitation, the Debtors' operations, the filing of these Chapter 11 Cases, the administration of the Debtors' cash, assets, real and personal property, the Asset Purchase Agreement, the formulating, negotiating, or implementing of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of these Chapter 11 Cases, or the Plan or the property to be distributed under the Plan.

(b)     Notwithstanding any other provision of the Plan, no holder of a Claim or Equity Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Creditor Trust, the Creditor Trustee, the Debtors, the Creditors' Committee, or any of their respective present or former members, officers, directors, employees, agents, advisors or attorneys, or professionals for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating, or implementing the Plan, the consummation of the Plan, the confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan.

(c)     Nothing in this section shall be construed (i) to exculpate any entity from fraud, gross negligence, willful misconduct, malpractice, criminal conduct, misuse of confidential

information that causes damages, or *ultra vires* acts or (ii) to limit the liability of the professionals of the Debtors, the Creditors' Committee and the Creditor Trust, to their respective clients pursuant to DR 6–102 of the Code of Professional Responsibility.

(d)     Notwithstanding anything contained herein to the contrary, nothing herein or otherwise shall be deemed a waiver, release, or discharge of any Claims by any governmental authority against any Person other than the Debtors on account of tax, environmental, or criminal liabilities.

(e)     Notwithstanding anything contained herein to the contrary, nothing herein or otherwise shall be deemed a waiver, release, discharge, or limitation upon any Assets and/or Rights of Action held by or to be transferred hereunder to the Creditor Trust, or the ability of the Creditor Trustee to prosecute, liquidate, or settle such Assets, Avoidance Actions and Rights of Action.

## Q.     Section 1146 Exception

Pursuant to Bankruptcy Code § 1146(c), the issuance, transfer or exchange of any security under the Plan, or the making or delivery of an instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

## R.     Severability

If the Bankruptcy Court determines that any provision of the Plan is unenforceable either on its face or as applied to any Claim transaction, the Creditors' Committee may modify the Plan in accordance with Section 13.1 so that such provision shall not be applicable to the holder of any Claim or Interest.  Such a determination of unenforceability shall not (i) limit or effect the enforceability and operative effect of any other provision of the Plan, or (ii) require the re-solicitation of any acceptance or rejection of the Plan.

**S.     Binding Effect**

The rights, benefits, and obligations conferred on any person by the Plan shall be binding upon, and inure of the benefit of the executors, successors, heirs, and assigns of and any persons claiming an interest in any Asset through such person.

**T.     Notices**

Any notices, requests, and demands to or upon the Debtors, the Creditors' Committee or the Creditor Trustee, to be effective, shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered to the following or, in the case of notice by facsimile transmission, when received by the following and telephonically confirmed, addressed as follows or to such other addresses as filed with the Bankruptcy Court.

> **If to the Debtors:**
>
> Samuel Jason Teele
> LOWENSTEIN SANDLER P.C.
> 65 Livingston Avenue
> Roseland, New Jersey 07068
> Telephone: (973) 597-2500
> Facsimile:  (973) 597-2400
>
> **If to the Creditor Trustee:**
>
> James Murphy
> Vice President, Corporate Trust Services
> U.S. Bank National Association
> 100 Wall Street , Suite 1600
> New York, NY 10005
> Telephone:   (212) 361-6174
> Facsimile:  ( 212) 514-6841

**If to the Creditors' Committee:**

Schuyler G. Carroll
ARENT FOX LLP
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990

**If to the US Trustee:**

Greg M. Zipes
Office of the United States Trustee
33 Whitehall Street, Floor 21
New York, New York 10004
Telephone: (212) 510-0500
Facsimile: (212) 668-2255

**U.**     **Right to be Heard**

Each of the Creditor Trustee, the Debtors, and the Creditors' Committee shall have the right to bring any dispute between them to the Bankruptcy Court for adjudication.

**V.**     **Closing of Case**

The Creditor Trustee shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

**W.**     **Section Headings**

The section headings contained in the Plan and the Disclosure Statement are for reference purposes only and shall not affect the meaning or interpretation of the Plan.

**X.**     **Continuing Viability of Other Orders/Agreements**

Except to the extent expressly modified by the Plan or the Asset Purchase Agreement, (i) all Final Orders previously entered by the Bankruptcy Court, and (ii) any agreements between

any of the Creditors' Committee, the Debtors, and their creditors shall continue in full force and effect.

**Y.  Entire Agreement**

Except to the extent incorporated herein by reference, the Plan supersedes all prior discussions, understandings, agreements, and documents pertaining or relating to any subject matter of the Plan.  In the event of a conflict between any of the provisions of the Plan, the Disclosure Statement, the Sale Order, or the Asset Purchase Agreement, the terms of the Plan shall govern, followed by the Disclosure Statement, the Sale Order, and lastly the Asset Purchase Agreement.

**Z.  Governing Law**

Except to the extent that the Bankruptcy Code is inapplicable, the rights, duties, and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York.

**AA.  Failure of Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising out of these Chapter 11 Cases, including any of the matters set forth in the Plan, the Plan shall not prohibit or limit the exercise of jurisdiction by any other court of competent jurisdiction with respect to such matter.

**ARTICLE V.
VOTING REQUIREMENTS**

**A.  Classes Entitled to Vote**

Any holder of a Claim in Classes 1, 2, or 3, which Claim has not been Disallowed by order of the Bankruptcy Court and against which no objection has been filed, shall be entitled to

vote to accept or reject the Plan if: (i) such holder's Claim has been scheduled by the Debtors (and such Claim is not scheduled as disputed, contingent or unliquidated), or (ii) such Claimant filed a proof of claim on or before the Bar Date.

Any holder of an Equity Interest in the Debtors is not entitled to vote to accept or reject the Plan because Class 4 will receive no distribution under the Plan and is presumptively deemed to have rejected the Plan pursuant to Bankruptcy Code § 1126(g).

A Claimant whose Claim is Disputed is not entitled to vote with respect to such Disputed Claim, unless the Bankruptcy Court, upon application by such Claimant and prior to the Confirmation Hearing, temporarily allows such Disputed Claim for the limited purpose of voting to accept or reject the Plan. A vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**B.      Vote Required for Acceptance by Classes of Claims**

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class which actually cast ballots for acceptance or rejection of the Plan. Thus, acceptance by a class of claims occurs only if at least two-thirds in dollar amount and a majority in number of the holders of such claims actually voting cast their ballots in favor of acceptance. A Class of Claims shall be deemed to accept the Plan in the event that no Claimant within that Class submits a Ballot by the Ballot Date.

CREDITORS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE DISCLOSURE STATEMENT ORDER AND THE PLAN FOR A FULL UNDERSTANDING OF VOTING REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, USE OF BALLOTS.

## ARTICLE VI.
## CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan.

### A.    Confirmation Hearing

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  By order of the Bankruptcy Court, the Confirmation Hearing has been scheduled for _____, 2010 at __:00 a.m. (Prevailing Eastern Time) before the Honorable Robert D. Drain, United States Bankruptcy Judge, in United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, NY 10601-4140. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Bankruptcy Code § 1128(b) provides that any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court and set forth the name of the objecting party, the nature and amount of the Claim or Equity Interest held or asserted by the objecting party against the Debtors' Estates or property, the basis for the objection and the specific grounds therefor.  The objection, together with proof of service thereof, must then be filed with the Bankruptcy Court, with a copy to chambers, and served upon: (a) counsel to the Debtors, Lowenstein Sandler PC, 1251 Avenue of the Americas, Floor 18, New York, NY 10020, Attn.: Jason S. Teele, Esq. (jteele@lowenstein.com), (b) counsel for the Creditors' Committee, Arent Fox LLP, 1675 Broadway, New York, NY 10019, Attn.: Schuyler G. Carroll, Esq. (carroll.schuyler@arentfox.com), (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor,

New York, NY 10004, Attn.: Greg M. Zipes, Esq., and (d) those parties filing notices of appearance in these cases.

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED BY _____, 2010 AT 4:00 P.M. (PREVAILING EASTERN TIME), IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.      Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code § 1129 are met. Among the requirements for confirmation are that the Plan (a) is accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (b) is feasible, and (c) is in the "best interests" of holders of Claims and Equity Interests impaired under the Plan.

**1.      Acceptance**

Claims in Class 1, 2, and 3 are impaired, and the holders of such Claims are entitled to vote on the Plan. Claims in Class 4 are impaired and are deemed to have rejected the Plan because they will not receive a distribution or retain any property under the Plan. Members of Class 4 are not entitled to vote because they are deemed to have rejected the Plan under Bankruptcy Code § 1126(g).

**C.      Feasibility**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor other than as set forth in such plan. The Debtors have already sold substantially all of their operating assets and ceased

business operations. The Plan contemplates that all remaining assets of the Debtors will be transferred to the Creditor Trust and liquidated by the Creditor Trustee pursuant to the terms of the Plan and the Creditor Trust Agreement. The Plan further contemplates that all proceeds of the Trust Assets will be distributed pursuant to the terms of the Plan. Since no further financial reorganization of the Debtors will be possible, the Creditors' Committee believes that the Plan meets the feasibility requirement. In addition, based upon the availability of assets for distribution, the Creditors' Committee believes sufficient funds will exist at confirmation to make all payments required by the Plan.

**D.      "Best Interests" Test**

With respect to each impaired class of claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accepts the Plan, or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

This analysis requires the Bankruptcy Court to determine what the holders of Allowed Claims and Allowed Equity Interests in each impaired class would receive from the liquidation of the Debtors' Assets in the context of a Chapter 7 liquidation case. Substantially all of the Debtors' operating assets have been sold. However, because of the value of the assets being reallocated by Signature for the benefit of holders of Allowed General Unsecured Claims, the value of the Debtors' Assets for distribution to Claimants in these Chapter 11 Cases exceeds the value such Claimants would have received in a Chapter 7 liquidating case.

To determine if the Plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the Debtors' unencumbered assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of Claims and Equity Interests under the Plan. A

quantified analysis of the recovery to creditors under a Chapter 7 case was prepared by Amper and is annexed hereto as Exhibit C.

Because of Signature's reallocation of a portion of its collateral to the Creditor Trust for the benefit of holders of General Unsecured Claims and the additional costs of liquidation under Chapter 7, the Creditors' Committee believes that confirmation of the Plan will provide each holder of an Allowed Claim with more than the amount it would otherwise receive pursuant to liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

E.     **REALLOCATION PLAN**

AS NOTED ABOVE, THE PLAN INCORPORATES THE REALLOCATION OF A PORTION OF THE PROCEEDS OF THE SALE FROM THE DEBTORS' SENIOR SECURED CREDITOR TO THE DEBTORS' GENERAL UNSECURED CREDITORS. THE CREDITORS' COMMITTEE BELIEVES, BUT CANNOT BE CERTAIN, THAT THE ESTATES WILL HAVE SUFFICIENT ASSETS TO SATISFY PRIORITY TAX CLAIMS IN FULL.

**ARTICLE VII.**
**FINANCIAL INFORMATION**

The Debtors have filed Statements of Financial Affairs and Schedules of Assets and Liabilities with the Bankruptcy Court as required by the Bankruptcy Code. This financial information may be examined in the Bankruptcy Court Clerk's Office at 300 Quarropas Street, White Plains, NY 10601, telephone: (914) 390-4060, website: http://www.nysb.uscourts.gov.

**ARTICLE VIII.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

If the Plan is not confirmed and consummated, the alternatives include (a) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code, or (b) dismissal of the Chapter 11 Cases.

If no plan can be confirmed, the Chapter 11 Cases may be converted to proceedings under Chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to their creditors in accordance with the priorities provided for in the Bankruptcy Code. The Creditors' Committee believes that conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code would result in diminished distributions to creditors due to the increased costs of administration in a Chapter 7 case. See Liquidation Analysis attached hereto as Exhibit C.

## ARTICLE IX.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Equity Interests. The Creditors' Committee offers no opinion as to any federal, state, local, or other tax consequences to holders of Claims and Equity Interests as a result of the confirmation of the Plan. All holders of Claims and Equity Interests are urged to consult their own tax advisors with respect to the federal, state, local, and foreign tax consequences of the Plan. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

## CONCLUSION AND RECOMMENDATION

The Creditors' Committee believes that the Plan is in the best interests of all holders of Claims and urges the holders of Claims in Class 3 to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Balloting Agent at the address set forth on page 6 of this Disclosure Statement so that they will actually be received on or before _____ at 4:30 p.m. (Prevailing Eastern Time).

Dated: New York, New York
        June 28, 2010

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

By:     */s/ Dan Pevonka*

        Dan Pevonka for R.R. Donnelly & Sons, Inc.
        Chair of the Official Committee of
        Unsecured Creditors of Creative Group, Inc., *et al.*

ARENT FOX LLP

By:     */s/ Schuyler G. Carroll*
        Andrew I. Silfen
        Schuyler G. Carroll
        David J. Kozlowski
        1675 Broadway
        New York, NY 10019

        *Attorneys for the Official
        Committee of Unsecured Creditors*